UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| S. O'REAR,<br><br>       Plaintiff,<br><br>   v.<br><br>ARMANDO DIAZ, MERKLEY + PARTNERS INC., OMNICOM GROUP INC.,<br><br>       Defendants. | Index No. **24-1669**<br><br>**COMPLAINT** |

  Merkley + Partners Creative Director Armando Diaz raped Plaintiff S. O'Rear after plying her with copious alcohol at the company's 2022 holiday party. When Ms. O'Rear announced that she was too intoxicated and needed to go home, Mr. Diaz feigned chivalry and offered to walk her to the train. He instead took her back to the office and sexually assaulted her in a bathroom.

  Mr. Diaz – a married man with four children - is a serial sexual predator whom young female employees are warned about early in their tenure. Mr. Diaz is known for making outrageous sexual comments about female employees in group meetings, being overtly "flirtatious", and went so far as to flash his naked body on a video call with another female employee.

  Merkley + Partners, in turn, is stuck in the Mad Men era, propagating a workplace typified by heavy drinking and predation of young female employees by senior male management. When Ms. O'Rear reported her sexual assault internally, Merkley + Partners concluded that Mr. Diaz had, in fact, sexually assaulted Ms. O'Rear. But instead of firing Mr. Diaz, they let him continue working in the same office where he sexually assaulted Ms. O'Rear for over a month *after* concluding their investigation. Merkley +

Partners then allowed Mr. Diaz to resign on his own terms, going so far as to make a golden parachute payment to him on his way out the door. Worse, Merkley + Partners blamed the victim, telling Ms. O'Rear that their ability to investigate her claim was compromised by her consumption of alcohol…provided by her rapist!

This an egregious case of sexual assault and sexual harassment that must be swiftly remedied.

Plaintiff S. O'Rear ("Ms. O'Rear"), by and through her undersigned counsel Josh Bernstein P.C., alleges as precedes and follows. In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial of this action.

## Nature of the Suit: Sexual Assault and Sexual Harassment

1. Plaintiff brings suit for Sexual Battery, Gender Motivated Violence, New York City Administrative Code § 10-1101 et seq., formerly § 8-903 et. seq., Negligent Supervision, and under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq., and the New York City Human Rights Law ("NYCHRL"), New York City Administrative Code § 8-101, et. seq.

## The Parties

2. Plaintiff S. O'Rear is a female adult U.S. citizen residing in the state of New York.

3. Defendant Armando Diaz ("Diaz") is a male adult U.S. citizen residing in the state of New Jersey.

4. Defendant Merkley + Partners Inc. ("Merkley") is a midsize advertising firm incorporated and headquartered in New York, NY. Merkley + Partners Inc. is a wholly-owned subsidiary of Defendant Omnicom Group Inc..

2

5. Defendant Omnicom Group Inc. ("Omnicom") is a global media and advertising firm incorporated and headquartered in New York, NY. Merkley and Omnicom shall be referred to collectively as the "corporate Defendants".

## Jurisdiction and Venue

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 (supplemental jurisdiction).

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1-2).

8. Plaintiff received right-to-sue letters from the EEOC as to her claims against both corporate defendants on or about February 7, 2024.

## The Facts

9. Ms. O'Rear began working for Merkley + Partners in February 2022 as a social media strategist.

### Diaz Plies Ms. O'Rear with Copious Alcohol, Sexually Harasses Her, and then Redirects Her from Going Home to the Merkley + Partners Office

10. On December 15, 2022, the Merkley + Partners office hosted a holiday happy hour. Ms. O'Rear had a few drinks with a group of her coworkers and Diaz.

11. The group then went to a nearby restaurant/bar, Bandits, where Diaz bought multiple rounds of drinks for the group. Diaz and another married male colleague mentioned to Ms. O'Rear that because she was single, they wanted to set her up. Diaz then proceeded to show Ms. O'Rear a photo of himself shirtless with several police officers (also shirtless), and Ms. O'Rear responded that she was not interested.

12. The group later moved on to another bar, The Garret, where Diaz again purchased multiple rounds of drinks. As the group approached the bar, Diaz noticed a woman across the room and said: "I love a woman in a beret." Diaz then turned to Ms. O'Rear and said:

3

"If you were wearing a beret, I would fuck you right now." A colleague of Ms. O'Rear's who was present at the time has confirmed this comment.

13. Diaz was sexually aggressive to junior female colleagues that evening to the point of groping one of Ms. O'Rear's colleagues.

14. Diaz attempted to solicit one of Ms. O'Rear's female colleagues, explaining that they could hook up in some sort of maternity/nursing room next to the bathroom where there were no cameras, which room Diaz inexplicably had a key to.

15. As the night progressed, Ms. O'Rear became intoxicated to the point of blacking out, well beyond the capacity of consent. Ms. O'Rear stated she needed to take the B train home, and Diaz offered to walk her to the train. A colleague of Ms. O'Rear's who was present that night has confirmed this dialogue and chain of events.

16. The reason Ms. O'Rear needed to go home is because of her state of advanced intoxication. Instead of walking Ms. O'Rear to the train, Diaz redirected Ms. O'Rear back to the Merkley + Partners office. At this point in time, Ms. O'Rear was fully blacked out.

**Diaz Rapes Ms. O'Rear in a Merkley + Partners Women's Bathroom**

17. Ms. O'Rear came-to in a toilet stall in the women's bathroom near the Greenwich conference room with Diaz, who had his penis out of his pants. Ms. O'Rear's first thought upon regaining consciousness was: "How did I get here? I don't want to do this". Ms. O'Rear declined to engage in oral sex when she came-to, then slipped back into unconsciousness and woke up the next morning with no recollection of how she got home. As described below, Ms. O'Rear later learned that Diaz had raped her while she was blacked out.

4

18. The next morning, Diaz called Ms. O'Rear on Microsoft Teams. Ms. O'Rear did not turn her video on, and Diaz stated that she should do so because she is a "pretty girl" and was otherwise flirtatious. At this point in time, Ms. O'Rear did recall regaining consciousness when Diaz's penis was out, but believed no sexual activity had taken place.

### Ms. O'Rear's Contemporaneous Text Messages to Her Friends

19. Ms. O'Rear was texting with her best friend over the course of the night. Between 9:19 PM and 9:30 P.M., Ms. O'Rear texted her friend that she was "wasted", "i'm drunk", and "i'm so drunk" in somewhat broken English.

20. After texting her friend the last "i'm so drunk", Ms. O'Rear wrote: "i tell u later", and then "BADDDDD". Her friend asked her what's bad while expressing concern, and Ms. O'Rear replied "coworker being married w 4 kids", "not my dad problem". Ms. O'Rear's friend followed-up to ensure Ms. O'Rear arrived home safely, and then asked Ms. O'Rear: "What happened w coworker!?". Ms. O'Rear responded "nothing m[ajor]", and the following day relayed that her and Diaz had made out.

    a. Later that week, Ms. O'Rear told another friend via text: "[I] haven't been that drunk in years", in reference to the night in question.

21. The next morning, Ms. O'Rear texted her friend group: "guysssssssssss fuck" "i did something so bad last night". One of her friends replied: "What???", and Ms. O'Rear explained: "i got really drunk after work and hooked up with my coworker who is married w 4 kids", "i'm like so ashamed", "we just made out and almost did more but we stopped ourselves", "but like his dick was out".

### Diaz Continues to Harass Ms. O'Rear, and Ms. O'Rear Learns About Other Sexual Harassment

22. The following week, on or about December 20, 2022, Diaz messaged Ms. O'Rear: "Are you sad?". Ms. O'Rear replied: "Why would I be?". Diaz responded: "Good :)".

23. On or about January 26, 2023, the Social/Digital team had a happy hour at Torch & Crown Brewery. By 7:30 P.M., Ms. O'Rear and her colleagues Sammi Arena and Heather Hopkins were the last Merkley + Partners employees at the happy hour. Ms. Hopkins disclosed to Ms. O'Rear and Ms. Arena that another creative director, Saks Afridi, had sexually harassed a young female producer who had then left the company, telling this junior employee: "you're the type of woman I would cheat on my wife with". This disclosure stuck with Ms. O'Rear, since Mr. Afridi was still working at Merkley + Partners in a very senior role, and the junior female colleague he had harassed was no longer with the company.

24. Over the next few months, Diaz attempted to flirt with Ms. O'Rear, routinely making quips about drinking or partying. Ms. O'Rear tried to avoid Diaz, only attending happy hours if/when she needed to cover for Merkley + Partners social, and usually asked other employees to create social media content while they were in attendance.

### Ms. O'Rear Learns She was Raped When Another Co-Worker Warns Her About Diaz

25. On or about May 4, 2023, the office hosted a Cinco De Mayo happy hour. Ms. O'Rear joined a group of employees playing Uno Flip. Diaz eventually came over and sat in the chair next to Ms. O'Rear.

6

26. A larger group eventually formed and moved to Caliente Cab Co.. As they arrived, Diaz ordered a round of tequila shots for the group, without asking anyone if they would like one.

27. As the group was mingling, Ms. O'Rear ended up in a one-on-one conversation with a male colleague. As the conversation progressed, this colleague warned Ms. O'Rear to "watch out" for Diaz.

28. Ms. O'Rear then made her way to the end of the table where Julia Endow, Saki Hoshiko, and Diaz were sitting. Ms. Endow and Ms. Hoshiko began talking one-on-one, and Ms. O'Rear spoke with Diaz. Diaz mentioned that he was going to a fashion show at Pratt the following week, and said he had two tickets to the show but could probably get another one if Ms. O'Rear wanted to join. Ms. O'Rear asked who the other ticket was for, and Diaz chuckled in response that it was for his wife.

29. Ms. O'Rear then asked Diaz what happened the night of the incident in question. Diaz responded by laughing and asking: "You don't remember?" After some dialogue, Ms. O'Rear responded: "The last thing I remember is not going down on you". Diaz responded: "Oh, we did everything." Ms. O'Rear responded: "Everything!?", and Diaz replied: "We did everything – you went down on me, I went down on you, we had sex." Ms. O'Rear was stunned, and said: "What about the cameras?" Diaz replied: "There are no cameras by that bathroom".

30. Ms. O'Rear then excused herself and went downstairs to the bathroom. Ms. O'Rear texted her group of friends: "guys i'm bugging a little bit, remember, months ago when i got really drunk and hooked up w my married coworker, he reminded me tonight we literally 'did everything'". One of Ms. O'Rear's friends asked: "like penetration", and

7

Ms. O'Rear replied: "i was so blackout that the last thing i remember is refusing to suck his dick".

31. Ms. O'Rear came back upstairs and tried to stay calm. She told a male colleague: "I just have to say this to someone because I'm freaking out but Armando took advantage of me after the holiday happy hour".

32. On or about May 10, 2023, Ms. O'Rear texted Kate Kennedy explaining that she had been a bit unresponsive because of the information Diaz told her.

### Ms. O'Rear Protects a Co-Worker from Diaz's Predations

33. On or about June 22, 2023, a large group of employees went to Amity Hall for a female colleague's graduation celebration. Diaz eventually arrived and proceeded to buy rounds of tequila shots for different groups of people, including Saki Hoshiko.

34. By around 7:00 P.M., Ms. Hoshiko was visibly intoxicated. Ms. O'Rear, Julia Endow, and Heather Hashizume told Ms. Hoshiko that she should go home. Ms. Hoshiko then mentioned that Diaz offered to walk her to the B train. Ms. O'Rear pulled Ms. Hoshiko and Ms. Hashizume aside and told them she didn't feel comfortable with Diaz walking Ms. Hoshiko to the train. Ms. Endow then handled getting Ms. Hoshiko home safely.

### Ms. O'Rear Discloses Her Rape and Breaks Down

35. On or about July 25, 2023, Ms. O'Rear met with Jennifer Cimmino and Zack Preschel about a project Ms. O'Rear was working on for Florida's Natural. The meeting took place on a red couch approximately 50 feet from where Ms. O'Rear was raped.

36. At the end of the meeting, Ms. O'Rear asked Ms. Cimmino if she could be taken off Merkley + Partners social media. Ms. Cimmino asked Ms. O'Rear if it was due to bandwidth, and Ms. O'Rear responded you could say that, and that Zack Preschel and

8

herself had agreed that Mr. Preschel does not need her help anymore as he is a social media strategist as well. The two had a back-and-forth on the topic, and then Ms. Cimmino asked Ms. O'Rear to stick around after the other meeting participants left.

37. Ms. Cimmino then laid into Ms. O'Rear, explaining she had: "heard some disturbing news coming out of your trip to Dallas". Ms. Cimmino explained that Barbara DiTimasso, the account person who was on the trip, told Ms. Cimmino that Ms. O'Rear had been drinking excessively with the client and had acted aggressively playing a card game. Ms. O'Rear began crying as Ms. Cimmino laid into her.

38. When Ms. Cimmino stopped talking, Ms. O'Rear explained that her actions do not reflect who she is, and that she has been sober since the last day of that trip. Ms. O'Rear mentioned she was on new medication and should not have been traveling or drinking. It then dawned on Ms. O'Rear that she had only agreed to go on that trip so that she did not have to work in the office with her rapist. Ms. O'Rear then told Ms. Cimmino that: "working for this company for the last two months has been hell", in reference to the time-period following the revelation that Diaz had raped her while unconscious.

39. Ms. Cimmino proceeded to ask Ms. O'Rear a series of questions.

> Q: Were you harassed? A: Yes.
> Q: Was it someone on our team? A: No.
> Q: Was it sexual? A: Yes.
> Q: Was it someone superior? A: Yes.

40. Ms. Cimmino proceeded to explain how titles don't matter and that Ms. O'Rear would be shocked to know everything people come to her about. Quite obviously, Ms. Cimmino would not have asked this series of questions unprompted were sexual harassment not rampant in the Merkley + Partners office.

41. As this point, Ms. O'Rear was crying uncontrollably. Ms. Cimmino kept telling Ms. O'Rear that she was there to talk and listen, and that Ms. O'Rear should make a report to HR. After further dialogue, Ms. O'Rear excused herself to the bathroom. She proceeded to experience a panic attack in the very bathroom where she was raped.

42. Ms. O'Rear eventually collected herself, splashed some water on her face, and walked back to her desk, passing two dozen people, including Diaz. A few of her female co-workers came to check on her, and advised Ms. O'Rear to go home. Ms. O'Rear promptly left the office.

43. In the interim, no one from Merkley + Partners checked-in with Ms. O'Rear. Ms. O'Rear then reached out to Ms. Cimmino to clarify that she was sexually assaulted by a senior member of Merkley + Partners, and that she did not feel comfortably coming into the office anymore.

**Ms. O'Rear Reports Her Rape,  
and Merkley + Partners Blame the Victim,  
Taking No Tangible Action**

44. Instead of immediately suspending Diaz and barring him from the office pending investigation, Merkley + Partners allowed Mr. Diaz to continue working from the office as if nothing happened, sitting at a desk mere feet from the bathroom where he raped Ms. O'Rear. Nor does it appear that Merkley + Partners changed the locks to the maternity/nursing room Diaz inexplicably had a key to.

45. Over the following months, Ms. O'Rear communicated with human resources over email with an individual by the name of Rebecca Lax. Ms. Lax's communications were insensitive and inconsiderate, and led, in part, to Ms. O'Rear to request leave as of September 6, 2023.

46. On July 26, 2023, Ms. Lax sent an email to Ms. O'Rear explaining that per her conversation with Ms. Cimmino, Ms. O'Rear had reported a "sexual assault". Sexual assault was placed in quotation marks. Over the following days, Ms. Lax followed-up, asking to speak with Ms. O'Rear concerning her report, and Ms. O'Rear responded asking for details concerning the investigation process, which Ms. Lax provided. A week later, Ms. Lax followed-up, referencing Ms. O'Rear's report that she was "sexually assaulted", again putting the terms sexual assault in quotation marks.

47. On August 18, 2023 Ms. O'Rear responded to Ms. Lax explaining that she was not ready to participate in an investigation, and asked Ms. Lax to stop asking her to participate in an investigation until Ms. O'Rear reached out to communicate what next steps she would like to take. Ms. O'Rear also wrote: "When you do reach out to me in the future, I'd like to also ask if you could please refrain from putting quotations around sexual assault as it makes me feel like you are implying that what I experienced didn't happen/doesn't qualify as sexual assault". Ms. Lax subsequently apologized.

48. On August 31, 2023, Ms. O'Rear sent Ms. Lax a formal report of her sexual assault and corroborating text messages.

49. On October 2, 2023, Ms. O'Rear had a call with Ms. Lax wherein Ms. Lax claimed that Merkley + Partners had intended to terminate Diaz, but he had been "tipped off" and resigned in advance.

50. By email of October 3, 2023, Ms. Lax explained that Diaz would continue working for Merkley + Partners until the end of the month, or November 8th at the latest. Ms. Lax explained that Diaz had been instructed not to contact Ms. O'Rear, and that if he did so, he would be fired. Accordingly, it is beyond dispute that Merkley + Partners did not fire

11

Diaz, but instead allowed him to continue working for well-over a month, and to leave the company on his own terms.

51. Ms. O'Rear asked for the investigation documents, and Ms. Lax refused to provide them. Ms. Lax relayed that Diaz denied having "intimate contact" with Ms. O'Rear at all, and that: "It is your word against his". Had Merkley + Partners conducted any semblance of a thorough, bona fide investigation, the company would have quickly learned that Diaz was a known sexual predator, to the extent the company was somehow ignorant of that fact.

52. At the end of this callous and defensive email, Ms. Lax wrote: "To start, we have limited control over interactions between co-workers, after hours, on their own time, and our ability to investigate and find objective evidence, camera footage, etc. decreases over time, **and gets worse when employees drink excessive amounts of alcohol**. Unfortunately, we cannot make rules or implement policies that would prevent incidents from happening under these circumstances." Emphasis added. In other words, the outcome of the investigation was that Diaz was allowed to continue working kiddy corner from the bathroom where he raped Ms. O'Rear for over a month, and Ms. O'Rear was at fault for drinking excessively, which compromised the investigation.

**Merkley + Partners Knowingly Tolerated a Serial Sexual Predator for Years**

53. Diaz was an open and notorious sexual harasser long before his sexual assault of Ms. O'Rear. As confirmed by the investigation conducted into Ms. O'Rear's claims, Diaz is a known quantity whom junior female hires on his team are warned about soon after joining the organization.

54. Diaz's MO was to pose as a protector, offering to walk drunk female colleagues to the train/home to ensure their safety.

55. Diaz made explicitly sexual comments about female colleagues in group meetings that in-it-of-itself created a hostile work environment, but Merkley took no action whatsoever against Diaz for his explicit and overt conduct.

**Merkley + Partners Continued to Harbor a Rapist After Ms. O'Rear's Complaint**

56. Instead of immediately suspending Diaz upon receiving Ms. O'Rear's complaint, Merkley + Partners allowed Diaz to continue working in the very office in which he raped Ms. O'Rear.

57. Indeed, after the investigation was concluded, and despite telling Ms. O'Rear that Merkley + Partners believed her, Merkley + Partners continued to employ Diaz from the very same office for over a month. This is despite the investigation confirming that Diaz is a serial sexual predator.

58. During the investigation, Ms. O'Rear was treated in a cruel and callous fashion, to the extent of blaming the victim for drinking on the night of her rape. Instead of immediately offering Ms. O'Rear the option to take a fully paid leave of absence, Merkley + Partners required Ms. O'Rear to expend her accumulated PTO and then apply for disability benefits.

**Omnicom's Domination of Merkley + Partners
and the Other Advertising Firms in Its Portfolio**

59. Merkley + Partners is a wholly-owned subsidiary of Omnicom. Merkley is the alter ego of Omnicom.

60. Omnicom dominates and controls Merkley, appoints and controls its Board of Directors, and directly determines who runs Merkley and is otherwise appointed to officer and leadership roles at Merkley.

61. Merkley – and other advertising firms in Omnicom's portfolio – use Omnicom's real estate as if it was its own.

62. Omnicom leases approximately half of the 410,000 square foot, 12-story building at 200 Varick Street, a building it has occupied for 25 years. Merkley's offices are in this building, and upon information and belief, Merkley does not pay rent to Omnicom for its space.

63. Numerous other advertising firms wholly-owned and dominated by Omnicom are also located in Omnicom's leased space in the same building.

64. Omnicom treats Merkley and other wholly-owned advertising firms in its portfolio as departments within the company rather than independent corporate entities. For example, when Omnicom won the Mercedes-Benz account, it took staff from various of its wholly-owned advertising firms to create "Team X" to service Mercedes-Benz, while incorporating firms with pre-existing relationships with Mercedes-Benz such as Merkley and BBDO into its "dedicated offering" to service Mercedes-Benz.

65. Merkley has zero business discretion in its dealings with Omnicom, and Omnicom does not deal with Merkley and its other wholly-owned subsidiary advertising firms at arms-length. Within Merkley, it is known and openly discussed that Omnicom ultimately runs the company.

66. Upon information and belief, Merkley is inadequately capitalized, and does not stand on its own separate and apart from Omnicom.

### Omnicom's Control of Merkley and Its Other Advertising Firms Through Its Use of Davis & Gilbert in an Externalized HR Function

67. Omnicom utilizes the law firm of Davis & Gilbert across its many wholly-owned subsidiary firms in an externalized human resources function, and through Davis & Gilbert, upon information and belief, directly controls – from time to time – employment decisions that it would have no input or influence on were Merkley and its other wholly-owned advertising firms truly separate and independent entities.

68. Here, Omnicom & Merkley deployed a Davis & Gilbert attorney to sit in on Ms. O'Rear's internal interview with HR. Accordingly, this attorney is a fact witness in this case.

69. The referenced attorney did not inform Ms. O'Rear that she did not represent Ms. O'Rear, or that she actually represented Merkley & Omnicom *against* Ms. O'Rear's potential legal claims, in violation of the New York Rules of Professional Conduct § 1.13(a). Had this attorney made such a disclosure, Ms. O'Rear would not have continued with the interview, and certainly would not have done so without being represented by her own counsel.

70. The referenced attorney did not state to Ms. O'Rear at any time before, during, or after the interview that she was sitting in on the interview in her capacity as legal counsel, or that her role was in preparation to defend legal claims. Instead, the HR representative on the call explained that the attorney's role was to answer any questions Ms. O'Rear may have had. This attorney went on to represent Merkley adversely to Ms. O'Rear, representing Merkley against Ms. O'Rear's legal claims.

71. Davis & Gilbert has an incestuous relationship with Omnicom's in-house counsel, with attorneys moving back and forth between Davis & Gilbert and Omnicom.

15

72. Davis & Gilbert represents Omnicom directly in many matters, and indirectly through its representation of wholly owned subsidiary advertising firms of Omnicom in numerous matters. Not infrequently, Davis & Gilbert represents both Omnicom and its wholly owned subsidiary advertising firms simultaneously, making no distinction between its representation of the ostensibly separate entities.

73. Davis & Gilbert also simultaneously represents Omnicom and its wholly-owned subsidiary advertising firms in litigation where both are named as defendants, such as in Fryer v. Omnicom Group Inc., 09 CV 9514 (S.D.N.Y), where Davis & Gilbert represented both Omnicom and OMD USA LLC.

### First Cause of Action: Sexual Battery
### Against the Individual Defendant

74. Plaintiff repeats and realleges the allegations contained in paragraphs 1-73 inclusive as if they were fully set forth herein.

75. The aforesaid actions of Diaz constitute battery under the laws of New York; Diaz intended to commit and did commit unwanted contact with Plaintiff in a harmful and offensive manner, including, but not limited to, sexually assaulting Plaintiff/causing sexual contact between Diaz and Plaintiff.

76. As a result of Diaz's conduct, Plaintiff has suffered and continues to suffer economic losses, mental anguish, pain and suffering and other damages. Plaintiff is also entitled to and demands an award of attorney's fees, costs, interest, and punitive damages.

### Second Cause of Action: Gender Motivated Violence
### Against the Individual Defendant

77. Plaintiff repeats and realleges the allegations contained in paragraphs 1-73 inclusive as if they were fully set forth herein.

78. The aforesaid actions of Diaz constitute a "crime of violence" against Plaintiff and is a "crime of violence motivated by gender" as defined in N.Y.C. Admin. Code § 10-1103 ("The term 'crime of violence' means an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction," and "The term 'crime of violence motivated by gender' means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender.").

79. As a result of Diaz's conduct, Plaintiff has suffered and continues to suffer economic losses, mental anguish, pain and suffering and other damages. Plaintiff is also entitled to and demands an award of attorney's fees, costs, interest, and punitive damages.

80. The above-described conduct of Diaz constitutes a sexual offense as defined in Article 130 of the New York Penal Law.

### Third Cause of Action: Negligent Supervision
### Against the Corporate Defendants

81. Plaintiff repeats and realleges the allegations contained in paragraphs 1-73 inclusive as if they were fully set forth herein.

82. During the relevant time-period, the corporate Defendants employed Diaz as a Creative Director.

83. The corporate Defendants knew or should have known of Diaz's propensity for sexual assault and sexual harassment, and knew or should have known that Diaz was unfit or incompetent to work directly with female employees and posed a particular risk

17

of sexually harassing and assaulting them, and also that this unfitness created a particular risk to Plaintiff and female employees of the corporate Defendants.

84. Diaz's sexual assault of Plaintiff occurred on the corporate Defendants' premises, and otherwise utilized the corporate Defendants' property.

85. The corporate Defendants' negligence in supervising and/or retaining Diaz was a substantial factor in causing harm to Plaintiff.

86. As a result of the corporate Defendants' conduct, Plaintiff has suffered and continues to suffer economic losses, mental anguish, pain and suffering and other damages. Plaintiff is also entitled to and demands an award of attorney's fees, costs, interest, and punitive damages.

### Fourth Cause of Action: Sexual Harassment Under Title VII
### Against the Corporate Defendants

87. Plaintiff repeats and realleges the allegations contained in paragraphs 1-73 inclusive as if they were fully set forth herein.

88. The aforesaid actions of the corporate Defendants constitute a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq.,.

89. As a result of the corporate Defendants' violation of Title VII of the Civil Rights Act of 1964, Plaintiff has suffered and continues to suffer economic losses, mental anguish, pain and suffering and other damages. Plaintiff is also entitled to and demands an award of attorney's fees, costs, interest and, because Defendant's actions were with malice or reckless indifference to Plaintiff's rights, punitive damages.

### Fifth Cause of Action:
### Sexual Harassment Under the New York City Human Rights Law
### Against All Defendants

88. Plaintiff repeats and realleges the allegations contained in paragraphs 1-73 inclusive as if they were fully set forth herein.

89. The aforesaid actions of the Defendants constitute a violation of the New York City Human Rights Law, New York City Administrative Code § 8-101 et. seq..

90. As a result of Defendants' violation of the New York City Human Rights Law, Plaintiff has suffered and continues to suffer economic losses, mental anguish, pain and suffering and other damages. Plaintiff is also entitled to and demands an award of attorney's fees, costs, interest and, because Defendants' actions were willfully or wantonly negligent or reckless of Plaintiff's rights, or consciously disregarded Plaintiff's rights, punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief: Judgment against Defendants awarding damages in an amount to be determined at trial including economic damages, compensatory damages, treble and/or liquidated damages, punitive damages, penalties, costs, interest, attorney's fees, and an award of such other and further relief as the Court deems just and proper.

Dated: March 5, 2024                                  Josh Bernstein, P.C.
                                                                        *Counsel for Plaintiff*

                                                              By:_____/s/_____
                                                                       Joshua Alexander Bernstein

                                                                       188 Grand St., 2nd Fl.
                                                                       New York, NY 10013
                                                                       (646) 308-1515
                                                                       jbernstein@jbernsteinpc.com