UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

S. O'REAR,

Plaintiff,

-v-

ARMANDO DIAZ *et al.*,

Defendants.

---

24 Civ. 1669 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion to disqualify defense counsel. Plaintiff S. O'Rear sues her employer Merkley + Partners Inc. ("Merkley"), Merkley's parent company, Omnicom Group Inc. ("Omnicom") (collectively, the "corporate defendants"), and individual defendant Armando Diaz. She alleges that Diaz, Merkley's creative director, sexually assaulted and raped her after a holiday happy hour. She brings federal claims of sexual harassment and negligent supervision under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"). She brings a New York state-law claim of sexual battery. And she brings New York City law claims of gender motivated violence under the Gender Motivated Violence Protection Act, N.Y.C. Admin. Code §§ 10-1101 *et seq.* ("GMVPA"), and sexual harassment under the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-502(a) *et seq.* ("NYCHRL").

O'Rear now moves to disqualify outside counsel for the corporate defendants—attorney Maureen McLoughlin, Esq., and her law firm Davis & Gilbert LLP ("Davis & Gilbert")—on the grounds that McLoughlin purportedly misled O'Rear in an investigative interview to believe that she was acting as O'Rear's attorney, and that McLoughlin is a potential fact witness at trial. For the reasons that follow, the Court denies the motion.

I.    **Factual Background**[1]

A.    **The Parties and Corporate Defendants' Counsel**

Merkley is a midsized advertising firm incorporated and headquartered in New York.

AC ¶ 4.  Omnicom is a global media and advertising firm also incorporated and headquartered in

New York.  *Id.* ¶ 5.  Merkley is a wholly owned subsidiary of Omnicom.  *Id.* ¶ 4.

O'Rear is a New York resident who works as a social media strategist for Merkley.

*Id.* ¶¶ 2, 9.  She began working for Merkley in February 2022.  *Id.* ¶ 9.  She is employed at

Merkley but is currently on a leave of absence.  Green Decl. ¶ 42.

Both Merkley and Omnicom are represented in this action by the Davis & Gilbert law

firm.[2]  Davis & Gilbert has one office, in Manhattan, with approximately 140 attorneys.

McLoughlin Decl. ¶ 3.  The firm has long been counsel to Omnicom and its subsidiaries,

including Merkley.  *Id.* ¶ 4.  McLoughlin is a partner in the firm's litigation and employment

practice group.  She has counseled Omnicom and Merkley for nearly 24 years.  *Id.* ¶¶ 1, 4.

B.    **O'Rear's Allegations Relating to Diaz's December 15, 2022 Sexual Assault**

1.    **The Sexual Assault**

On December 15, 2022, Merkley hosted a holiday happy hour for its employees.  AC

¶ 10.  At the happy hour, O'Rear had several drinks with coworkers, including Diaz.  *Id.*

Afterwards, O'Rear and a group of coworkers moved to a different bar, where Diaz bought

multiple rounds of drinks for the group.  *Id.* ¶ 11.  As the night progressed, O'Rear became

---

[1] The Court's account of the facts is drawn from the First Amended Complaint, Dkt. 40 ("AC"), and the declarations submitted in connection with the motion to disqualify, Dkt. 18 ("Bernstein Decl."); Dkt. 26 ("Milligan Decl."); Dkt. 27 ("Green Decl."); Dkt. 29 ("McLoughlin Decl."); Dkt. 30 ("O'Rear Decl.").  The facts recited are those necessary to decide the pending motion.

[2] Three Davis & Gilbert attorneys have entered a notice of appearance in the case: Angela Dunay, Neal Klausner, and McLoughlin.

intoxicated to the point of blacking out.  *Id.* ¶ 15.  Late in the night, O'Rear stated she needed to take the subway to get home.  *Id.*  Diaz offered to walk her to the station.  *Id.*  However, instead of walking O'Rear to the subway station, Diaz directed her to Merkley's office.  *Id.* ¶ 16.  At this point, O'Rear alleges, she "was fully blacked out."  *Id.*  Diaz took O'Rear to a bathroom near a conference room.  *Id.* ¶ 17.  The last thing she remembers from that night is that Diaz "had his penis out of his pants"; she, however, refused to engage in oral sex.  *Id.*  She woke up the next morning "with no recollection of how she got home."  *Id.*

Initially, O'Rear believed that no sexual activity had taken place between her and Diaz. *Id.* ¶ 18.  However, on May 4, 2023, O'Rear learned from Diaz that the two had engaged in penetrative sex on December 15.  *Id.* ¶ 29.  O'Rear alleges that the sexual encounter was not consensual on her part because she had been too intoxicated to consent.  She therefore alleges that Diaz sexually assaulted and raped her that night.

### 2.    Merkley's Ensuing Internal Investigation

On July 25, 2023, O'Rear disclosed to a higher-up at the company—Jennifer Cimmino— that she had been sexually assaulted by a senior member of Merkley's leadership team and that she no longer felt comfortable coming into the office.  *Id.* ¶¶ 35, 43.

The next day, Cimmino conveyed O'Rear's report of sexual assault to Rebecca Green, executive director of Merkley's human resources department.  Green Decl. ¶ 6.[3]  That day, Green emailed O'Rear, asking if she had time to discuss her report.  *Id.*, Ex. 1 at 10.  O'Rear responded that she was not in the best mental space to have that conversation and needed to talk to her therapist before discussing the issue further.  *Id.*  That evening, Green emailed O'Rear, offering assistance, suggesting she should apply for paid time off, and asking whether law enforcement

---

[3] Rebecca Green is identified in the AC and other papers filed by O'Rear as "Rebecca Lax."  Her declaration, however, states that her last name today is "Green."  *See* Green Decl. n.1.

needed Merkley's assistance.  *Id.* at 9.  Green added: "If you feel comfortable telling me what happened (or, in particular, who this may have involved), it would be greatly helpful in making sure we are protecting the safety and well-being of you and all our people."  *Id.*

The following day, July 27, 2023, O'Rear accepted Green's invitation to take time off from work.  *Id.*  But O'Rear expressed hesitation in setting up a call with Green.  In an August 2, 2023 email, O'Rear stated: "I understand you'd like to speak as soon as possible, I am still trying to figure out when I am comfortable speaking and appreciate your patience as I figure this out." *Id.* at 8.  O'Rear also asked to continue working from home because she did not feel comfortable returning to the office.  *Id.*

After this exchange, O'Rear continued to email with Green.  She posed questions about the investigation process, Merkley's harassment training program, and the company's reporting policy.  Green Decl. ¶ 12.  In these emails, Green reiterated her interest in obtaining information so she could open an investigation.  *Id.* ¶ 14.  On August 18, 2023, O'Rear replied that she was "not currently ready to participate in an investigation."  *Id.*, Ex. 1 at 5.  She added: "I would like to ask you to kindly pause asking me to do so until I communicate to you what next steps I'd like to take, as my understanding is that I am not obligated to provide additional information or participate in an investigation."  *Id.* at 5–6.

On August 31, 2023, O'Rear sent Green a formal report recounting her sexual assault, plus corroborative text messages.  AC ¶ 48.  Green represents that upon reading the report, she learned, for the first time, that O'Rear had identified Diaz as the perpetrator.  Green Decl. ¶ 17.

On September 5, 2023, Green emailed O'Rear that she would be opening an internal investigation into O'Rear's claims and that she had reached out to Cara Milligan, the global deputy general counsel of Diversified Agency Services ("DAS"), an Omnicom division, whom

Green described as "the Omnicom/DAS attorney who supports Merkley and other DAS agencies." *Id.*, Ex. 1 at 4. Green's email stated that Milligan "is responsible for overseeing investigations of this nature" and that Green would "take guidance from her." *Id.* Green added that she did not need to interview O'Rear because she had submitted a formal written report describing the complaint. *Id.* Green's email described, as follows, the investigation she planned to conduct.

> [A] workplace investigation usually proceeds with interviews of other employees who we believe will have relevant information. We will include Armando Diaz among the employees we interview. It may or may not be disclosed to him during the interview that you have made this report, as we try and keep confidential as much information about the investigation as we can. Our goal is to conduct a thorough investigation while maintaining the privacy of the reporting employee. Therefore, we do not intend to provide all of the details of your incident report to employees whom we interview, unless necessary. It is important that you too keep this matter confidential while we conduct the investigation. We want employees to respond to our questions in the moment, rather than having planned responses.

*Id.*

O'Rear wrote back a few minutes later and asked to have a call. Green later scheduled the call for September 6, 2023. Green Decl. ¶ 19. Before the call, Green sent O'Rear another email, stating:

> Just a heads up, Cara Milligan has asked that Maureen McLoughlin, an outside lawyer, join our call today to answer your questions. (She is not going to ask you questions, but she can answer your questions as she is more experienced in this process.) So the call will be you, me and Maureen.

*Id.*, Ex. 2 at 2.

McLoughlin attests that she understood that she "was to join the September 6 call only to answer any questions posed by Ms. O'Rear about the investigation process, in case Ms. Green could not answer Ms. O'Rear's questions about next steps in Merkley's investigation of her report." McLoughlin Decl. ¶ 6.

The September 6 call on Microsoft Teams began at 1:15 p.m. and lasted about 20 minutes. Green Decl. ¶ 21. O'Rear recorded at least a portion of the call and, in connection with

5

her motion, has furnished a copy of a recording of a portion of the call to the Court.  *See* O'Rear

Decl. (providing Dropbox link of recording).[4]  The recording reflects that Green began the call

by thanking O'Rear for having come forward with her complaint.  She then stated that she and

McLoughlin were there to listen and support her.  O'Rear Decl., Ex. 3 ("Recording") at 00:09.

Green also stated that McLoughlin was joining the call because she had experience with prior

investigations from working with "Omnicom and other agencies," and that she would be

available to answer any questions that Green could not answer.  *Id.* at 00:22–00:26.  For most of

the call, O'Rear described her recollection of what happened on December 15, 2022, and

relevant interactions she had with Diaz and other coworkers between December 15, 2022 and

July 25, 2023, when she first reported the sexual assault to her supervisor.  *Id.* at 00:32–12:00.

O'Rear also asked Green about the steps she needed to take for Merkley to approve her leave of

absence, explaining that it had been incredibly difficult for her to focus on work while dealing

with the trauma of her assault.  *Id.* at 14:10–15:02.  During the call, Green told O'Rear that

"everything remains confidential"; that she was "keeping this very closed in terms of who

knows"; and that she would "try to limit the people that [she] talked to to keep that circle small."

*Id.* at 12:30–12:46.

Towards the end of the call, Green stated that she had involved McLoughlin, "who's a

third party to help in that process of neutrality and confidentiality as well."  *Id.* at 17:45–17:52.

McLoughlin then spoke for the first time.  She briefly stated: "I know it's weird to have another .

---

[4] O'Rear recorded at least a portion of the call.  But the recording supplied to the Court begins
with Green, mid-sentence, stating that she appreciated O'Rear's courage in coming forward with
her complaint.  A portion of the call preceding this point thus was either not recorded (or was
recorded but not supplied in full to the Court).  It is not clear how much of the call is missing.
On the submissions to the Court, there is no evidence that McLoughlin and Green knew that
O'Rear was recording the call.

. . lawyer on the phone.  You don't know me.  But as [Green] mentioned, I've participated in quite a number of investigations."  *Id.* at 17:57–18:08.  McLoughlin also stated that she was working with Green to "make sure that this is handled thoroughly, seriously, discreetly."  *Id.* at 18:10–18:19.  She reiterated that she and Green would try to keep O'Rear's information confidential for the purpose of protecting O'Rear's privacy interests and to maintain the investigation's integrity.  *Id.* at 18:25–19:05.  McLoughlin stated that, because Green intended to interview employees as part of the investigation, they too would prefer that employees have not previously discussed O'Rear's report with other employees.[5]  McLoughlin did not otherwise speak during the meeting.

---

[5] In their declarations, both McLoughlin and Green deny having told O'Rear "that what was discussed on the call would be kept confidential."  McLoughlin Decl. ¶ 10; *see also* Green Decl. ¶ 28 ("During the September 6 call, Ms. O'Rear did not ask that anything that was discussed be kept confidential.  In fact, as stated, at the beginning of the call, she identified several Merkley employees with whom she already had discussed the assault.  Neither Ms. McLoughlin, nor I, stated that the call was confidential or would be kept confidential.").  These statements are not flatly false, as O'Rear claims.  On the contrary, as explained below, McLoughlin and Green made clear to O'Rear that her account would likely be disclosed to some others.  But, as O'Rear's recording reflects, Green's and McLoughlin's denials of any promise of confidentiality are misleading.  As the recording reflects, Green and McLoughlin each told O'Rear that they would at least try to keep the information she supplied confidential.

That said, O'Rear's present claim to have expected her account of the assault to go no further than Green and McLoughlin cannot be taken seriously.  Green's email to O'Rear arranging the call notified O'Rear that "we do not intend to provide *all of the details* of your incident report to employees whom we interview, *unless necessary*."  Green Decl., Ex. 1 at 4.  That statement conveyed that some aspects of the report would likely be shared with some persons, and that there was a potential for the entire report to be disclosed.  Green's email to O'Rear also stated that O'Rear's account might be shared with Diaz, the perpetrator.  And the references during the call to being "discreet" (McLoughlin) and to "try[ing] to limit the people that [they] talked to to keep that circle small" (Green) put O'Rear on notice—as a person in her situation reasonably would have appreciated—that at least the substance of her account would be likely have to be disclosed to *some* other persons—to enable the company to decide whether to take employment action against Diaz, whether to modify O'Rear's working conditions, and/or whether to report the incident to law enforcement.  Green also notified O'Rear during the call and in later emails that as part of the investigation, she planned to interview other employees.  Such interviews, by their nature, had some capacity to suggest the nature of the allegation being investigated.

A disputed issue, in light of O'Rear's present claim to have believed that McLoughlin was representing her personally, is how McLoughlin was identified to O'Rear on the call. In Green's pre-call email, McLoughlin was referred to as an "outside lawyer" who could "answer your questions" but would not be posing questions of her own. Green Decl., Ex. 2 at 2. In her declaration recounting the call, McLoughlin states: "I also recall that I either introduced myself as an attorney or partner with [Davis & Gilbert], representing Merkley and/or as the attorney for the company, or Ms. Green introduced me that way. It is certainly my practice, over the past 24 years, to introduce myself as a [Davis & Gilbert] attorney and identify my client(s) specifically or use 'company' to describe my client(s). I absolutely did not tell Ms. O'Rear that I was representing her." McLoughlin Decl. ¶ 7. Green similarly attested: "I recall that Ms. O'Rear and I joined the call shortly before Ms. McLoughlin and exchanged pleasantries until Ms. McLoughlin joined the call. When she did, I believe that Ms. McLoughlin was introduced as a Merkley and/or agency and/or company attorney; I cannot recall if Ms. McLoughlin introduced herself or if I made the introduction." Green Decl. ¶ 22. O'Rear, however, denies that any such disclosure was made, and states that she took away the understanding that McLoughlin "was functioning as my advocate and legal counsel." Bernstein Decl., Ex. 2 ¶ 8.

Because the portion of the call that O'Rear has furnished to the Court does not capture the start of the conversation, *see supra* note 4, the recording neither confirms nor refutes McLoughlin's representation that she was identified to O'Rear at the start of the call as counsel for the company. Green's statement to O'Rear that McLoughlin had experience with prior investigations from working with "Omnicom and other agencies," Recording at 00:22–00:26, is consistent with her having previously represented the company, but is not dispositive of the point. Green's only other potentially relevant statement on the recording—towards the end,

referring to McLoughlin as "a third party to help in that process of neutrality and confidentiality," *id.* at 17:45–17:52—does not shed light on this point.

After the September 6 call, O'Rear never asked Green or anyone else at Merkley for McLoughlin's email address or phone number. Green Decl. ¶ 29. Nor did O'Rear ever email, contact, or seek to contact McLoughlin. *Id.* When O'Rear later communicated with Green, O'Rear did not ask that McLoughlin or another Davis & Gilbert attorney join or be copied on these communications. *Id.*

After the call, Green, the human resources executive director, investigated O'Rear's sexual assault claim. *Id.* ¶ 31. As part of the investigation, she interviewed several Merkley employees whom O'Rear had named in her report. *Id.* ¶ 32. In total, Green interviewed eight people, including Diaz. *Id.* McLoughlin and Green both attest that McLoughlin did not lead or conduct the investigation into O'Rear's claim. They acknowledge, however, that McLoughlin provided Merkley with legal advice about O'Rear's claim. *See* McLoughlin Decl. ¶ 5 ("I did not conduct the investigation, but provided, and continue to provide, legal advice to Merkley concerning the investigation, the letter that Ms. O'Rear's counsel sent to Merkley, as detailed below, the EEOC Charge, and this lawsuit."). McLoughlin was also on the call when Diaz was interviewed. Green Decl. ¶ 32.

On October 2, 2023, O'Rear had a call with Green. During the call, Green stated that Merkley had intended to terminate Diaz, but that he had been "tipped off" and "resigned in advance." AC ¶ 49. Over email the next day, Green explained that Diaz would continue working until the end of the month or November 8 at the latest. *Id.* ¶ 50.

## II.    Procedural History

On March 5, 2024, O'Rear filed the Complaint. Dkt. 1 ("Compl."). On March 12, 2024, O'Rear moved to disqualify McLoughlin and the Davis & Gilbert firm as counsel for Merkley,

Dkt. 17, and submitted a memorandum of law, Dkt. 19 ("Pl. Mem.") and a declaration in

support, Dkt. 18 ("Bernstein Decl.").  On March 27, 2024, corporate defendants filed a

memorandum of law in opposition, Dkt. 25 ("Def. Opp."), and three declarations in support,

Dkts. 26 ("Milligan Decl."), 27 ("Green Decl."), 29 ("McLoughlin Decl.").  On April 3, 2024,

O'Rear filed a reply, Dkt. 31 ("Reply"), and a supporting declaration, Dkt. 30 ("O'Rear Decl.").[6]

On July 31, 2024, corporate defendants filed a motion to dismiss the AC.  Dkt. 54.  That

same day, O'Rear filed a letter motion asking that the Court expedite ruling on the motion to

disqualify.  Dkt. 57.  On August 16, 2024, the Court issued an order resolving discovery disputes

and stating that it was prioritizing resolution of the motion to disqualify.  Dkt. 66.

## III.    Applicable Legal Standards

### A.    Standards Applicable to Motions to Disqualify

"The authority of federal courts to disqualify attorneys derives from their inherent power

to 'preserve the integrity of the adversary process.'"  *John Wiley & Sons, Inc. v. Book Dog*

*Books, LLC*, 126 F. Supp. 3d 413, 418–19 (S.D.N.Y. 2015) (quoting *Hempstead Video, Inc. v.*

*Inc. Vill. Of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005)).  "Generally, disqualification

motions are disfavored, as they are often interposed for tactical reasons, and . . . even when made

in the best of faith, such motions inevitably cause delay."  *Copantitla v. Fiskardo Estiatorio,*

*Inc.*, 788 F. Supp. 2d 253, 281 (S.D.N.Y. 2011) (citation and internal quotation marks omitted).

Accordingly, such motions are "subjected to a high standard of proof."  *Id.* (citing *Merck Eprova*

---

[6] On April 5, 2024, Merkley and Omnicom filed a motion to dismiss the Complaint for failure to state a claim, under Federal Rule of Civil Procedure 12(b)(6).  After the Court issued an amend or oppose order, Dkt. 36, O'Rear filed the operative Amended Complaint, Dkt. 40 ("AC").  The Court also issued an order stating that its initial assessment was that the pendency of the motion to disqualify did not preclude the Court from resolving the motion to dismiss, and that briefing on the motion to dismiss could therefore continue.  Dkt. 35.  The Court directed O'Rear to file a letter by April 10, 2024, if she took a different view.  *Id.*  O'Rear did not file such a letter.

*AG v. ProThera, Inc.*, 670 F. Supp. 2d 201, 2017 (S.D.N.Y. 2009)).  "Disqualification is only warranted in the rare circumstance where an attorney's conduct 'poses a significant risk of trial taint.'"  *Decker v. Nagel Rice LLC*, 716 F. Supp. 2d 228, 231 (S.D.N.Y. 2010) (quoting *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981)).  However, "any doubt is to be resolved in favor of disqualification."  *John Wiley*, 126 F. Supp. 3d at 419.

Although federal courts look to state disciplinary rules in considering motions to disqualify, "such rules need not be rigidly applied as they merely provide general guidance." *Mori v. Saito*, 785 F. Supp. 2d 427, 432 (S.D.N.Y. 2011) (citation and internal quotation marks omitted).  Rather, "[t]he disqualification of an attorney in order to forestall violation of ethical principles is a matter committed to the sound discretion of the district court."  *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990) (citation omitted).

### B.      Standards Applicable to O'Rear's Motion for Disqualification Based on McLoughlin's Prior Representation of Her

One basis for O'Rear's disqualification motion is her claim that McLoughlin held herself out to O'Rear as representing O'Rear.  On that premise, O'Rear argues, McLoughlin cannot now be adverse to O'Rear in her lawsuit against Merkley and Omnicom, because she is in possession of confidences gained in her capacity as O'Rear's counsel.

To disqualify opposing counsel on conflict-of-interest grounds to protect the confidences of a former client, a movant must establish three elements: "(1) the party is a former client of the attorney; (2) the attorney had access to, or was likely to have had access to, relevant privileged information in the course of the alleged prior representations; and (3) there is a substantial relationship between the subject matter of the (alleged) prior representation and the issues in the current action."  *Ello v. Singh*, No. 05 Civ. 9625 (KMK), 2006 WL 2270871, at *3 (S.D.N.Y. Aug. 7, 2006) (citing *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983)).

To resolve the first element, a court must determine whether an attorney-client relationship actually existed. "The formation of an attorney-client relationship hinges upon the client's [reasonable] belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice." *Diversified Group, Inc. v. Duagerdas*, 139 F. Supp. 2d 445, 454 (S.D.N.Y. 2001) (citation and internal quotation marks omitted). "There is no single, well-defined test used to determine whether an attorney-client relationship exists; rather, a court must weigh a number of factors." *Parkins v. St. John*, No. 01 Civ. 11660, 2004 WL 1620897, at *4 (S.D.N.Y. July 19, 2004). Courts generally rely on six factors to determine whether such a relationship exists: (1) whether a fee arrangement was entered into or a fee paid; (2) whether a written contract or retainer agreement exists indicating that the attorney accepted representation; (3) whether there was an informal relationship whereby the attorney performed legal services gratuitously; (4) whether the attorney actually represented the individual in one aspect of the matter (*e.g.*, at a deposition); (5) whether the attorney excluded the individual from some aspect of the litigation in order to protect another client's interest; and (6) whether the purported client believes that the attorney was representing her and whether this belief is reasonable. *Merck Eprova AG v. ProThera, Inc.*, No. 08 Civ. 35 (RMB) (JCF), 2009 WL 10696470, at *7 (S.D.N.Y. Oct. 6, 2009) (citing *Med. Diagnostic Imaging, PLLC v. CareCore Nat., LLC*, 542 F. Supp. 2d 296, 307 (S.D.N.Y. 2008)).

However, a "formal attorney-client relationship" is not necessarily required, as "ample case law makes clear that an attorney nonetheless may be disqualified despite the lack of a formal attorney-client relationship" in the presence of other factors, to "avoid fundamental unfairness." *Blue Planet Software, Inc. v. Games Int'l, LLC*, 331 F. Supp. 2d 273, 276 (S.D.N.Y. 2004). For instance, a significant risk of trial taint may be present "when an attorney . . . might

benefit a client in a lawsuit by using confidential information about an adverse party obtained through prior representation of that party." *Id.* (citing *Glueck*, 653 F.2d at 748). Thus, "disqualification may be appropriate when an attorney gains access to the confidences even of someone who is not formally a client." *Blue Planet Software*, 331 F. Supp at 276.

### C.    Standards Applicable to O'Rear's Motion for Disqualification Based on the Witness-Advocate Rule

A second basis for O'Rear's disqualification motion is the witness-advocate rule, as set forth in Rule 3.7 of the New York Rules of Professional Conduct. It provides that, subject to certain exceptions, "[a] lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact." N.Y. Rules Pro. Conduct R. 3.7(a). "When one individual assumes the role of both advocate and witness it '[may] so blur[] the line between argument and evidence that the jury's ability to find facts is undermined.'" *Ramey v. Dist. 141, Int'l Ass'n of Machnists & Aerospace Workers*, 378 F.3d 269, 283 (2d Cir. 2004) (quoting *United States v. Arrington*, 867 F.2d 122, 126 (2d Cir. 1989)). For example, "[a] jury may view an attorney as possessing special knowledge of a case and therefore accord a testifying attorney's arguments undue weight." *MacArthur v. Bank of N.Y.*, 524 F. Supp. 1205, 1208 (S.D.N.Y. 1981).

"Because courts must guard against the tactical use of motions to disqualify counsel, they are subject to fairly strict scrutiny, particularly motions under the witness-advocate rule." *Murray v. Metropolitan Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009) (internal quotation marks omitted). Disqualification under Rule 3.7(a) "is triggered only when the attorney actually serves as an advocate before the jury." *Finkel v. Frattarelli Bros.*, 740 F. Supp. 2d 368, 373 (E.D.N.Y. 2010); *see Ramey*, 378 F.3d at 282 ("The advocate-witness rule applies, first and foremost, where the attorney representing the client before a jury seeks to serve as a fact witness *in that*

*very proceeding*.").  Additionally, disqualification is warranted only where the testimony given

by counsel is necessary.  *Finkel*, 740 F. Supp. 2d at 373.

## IV.    Discussion

O'Rear separately moves to disqualify McLoughlin and her law firm, Davis & Gilbert.

The Court analyzes these motions in turn.

### A.    Motion to Disqualify McLoughlin

O'Rear argues for McLoughlin's disqualification on three distinct grounds.

#### 1.    Conflict Based on Prior Representation

O'Rear first argues that McLoughlin, an attorney of record for the corporate defendants,

should be disqualified because she purportedly held herself out as O'Rear's counsel during the

September 6, 2023 call.  O'Rear contends that because McLoughlin presented herself as such,

McLoughlin cannot now represent O'Rear's opponents—Merkley and Omnicom—in litigation.

The Court rejects this argument as factually baseless.  The assembled record makes

implausible any claim by O'Rear to have believed that McLoughlin, on the call, was acting as

her "advocate and legal counsel."  Bernstein Decl., Ex. 2 ¶ 8.  And even if O'Rear's claim to

have subjectively believed this were credited, the record makes that belief objectively

unreasonable.

O'Rear's only bases for claiming such a belief is McLoughlin's participation in the

September 6 call and the statements on that call.  But on the call, even by O'Rear's account,

McLoughlin never held herself out as counsel to O'Rear.  Nor did she at any point discuss any of

the duties and obligations incident to an attorney-client relationship.  And the partial recording

disclosed by O'Rear reflects that McLoughlin did not make any statement or take any action

consistent with the initiation, even informally, of an attorney-client relationship with O'Rear.  On

the contrary, the call overwhelmingly consisted of a conversation between O'Rear and Green—a

Merkley human resources executive—about Merkley's forthcoming investigation of O'Rear's claim. On the call, McLoughlin indicated that she was on the call to support Green—that is, Merkley—in the investigation, as Green indicated McLoughlin had in prior investigations. That introduction does not accord with—instead it undermines—O'Rear's claim to have reasonably understood McLoughlin to be her counsel, as opposed to Merkley's. There is no evidence that O'Rear and McLoughlin ever communicated again, or that either ever sought thereafter to communicate with the other.

Given the limited, informal, and relatively quotidian interaction between McLoughlin and O'Rear, no factor considered in determining whether an attorney-client relationship existed, *see Merck Eprova*, 2009 WL 10696470, at *7, favors O'Rear's claim that such existed here.

First, McLoughlin and O'Rear never signed a fee arrangement, and a fee was never paid. *Adams v. Vill. of Keesville*, No. 07 Civ. 452, 2008 WL 3413867, at *8 (N.D.N.Y. Aug. 8, 2008) (denying disqualification motion in part because "there was neither a retainer agreement, fee arrangement nor a fee paid"); *Parkins*, 2004 WL 1620897, at *4 (denying disqualification motion in part because "no fee arrangement was ever entered into, nor did [d]efendants ever pay [the attorney] any fee"); *First Hawaiian Bank v. Russell & Volkening, Inc.*, 861 F. Supp. 233, 239 (S.D.N.Y. 1994) (denying disqualification motion primarily because "no fee arrangement or retainer agreement was made or discussed, no fee was ever requested from or paid by Seldes, and, moreover, Kenyon [the attorney] appears at no time to have taken direction from Seldes").

Second, McLoughlin and O'Rear did not enter a written contract, retainer agreement, or any other type of formal or informal agreement indicating that McLoughlin had agreed to take on O'Rear's representation. *See, e.g.*, *Ello*, 2006 WL 2270871, at *3 (denying motion to disqualify in part because "[p]laintiff does not maintain, nor could he maintain, that he entered into a formal

arrangement with either law firm to provide representation"); *Parkins*, 2004 WL 1620897, at \*4

(denying motion to disqualify in part because "[n]either party has introduced evidence of a

formalized written contract laying-out the terms of the purported arrangement"); *Kubin v. Miller*,

801 F. Supp. 1101, 1115 (S.D.N.Y. 1992) (denying disqualification on account of a claimed

previous attorney-client relationship with opposing counsel, because "there was no written

contract between Kubin and Greenman indicating that Greenman ever accepted employment as

Kubin's attorney").

       Third, an informal attorney-client relationship was never initiated because McLoughlin

did not perform any legal work on O'Rear's behalf. *See, e.g.*, *In re Sears Holdings Corp.*, 6128

B.R. 402, 414 (S.D.N.Y. 2021), *aff'd*, No. 21-1095, 2023 WL 3938982 (2d Cir. June 12, 2023)

(affirming bankruptcy court's denial of disqualification motion in part because allegedly

conflicted counsel provided only "technical support and guidance, which is distinct from legal

assistance"); *Apr. Broad., Inc. v. Smith*, No. 95 Civ. 7664 (LMM), 1996 WL 137487, at \*4

(S.D.N.Y. Mar. 27, 1996) (denying motion to disqualify Jones Day in part because "Smith does

not appear to have sought advice from Jones Day regarding any specific legal issues"); *Parkins*,

2004 WL 1620897, at \*4 (denying disqualification motion in part because attorney "only agreed

to provide business (not legal) advice").

       Fourth, as explained above, McLoughlin did not represent, or hold herself out as

representing, O'Rear in connection with any aspect of the matter at hand (O'Rear's report to

Merkley of Diaz's misconduct). *See, e.g.*, *Kubin*, 801 F. Supp. at 1115 (finding absence of

"informal relationship in which [attorney] performed legal services gratuitously" as counseling

against granting disqualification motion); *Ritchie v. Gano*, No. 07 Civ. 7269 (VM) (JCF), 2008

WL 4178152, at \*6 (S.D.N.Y. Sept. 8, 2008) (denying disqualification motion in part because

there was no evidence that the attorney "ever appeared in court or claimed to represent an entity known as the Violent Femmes in any court filing associated with this issue or any other").

Fifth, McLoughlin never acted to exclude O'Rear from some aspect of her dealings with Merkley, in a manner suggesting a need to protect O'Rear's distinct interests. No such scenario presented itself: at all times, before and during this litigation, McLoughlin represented Merkley, and had limited dealings with O'Rear. *See Breuninger v. Williams*, No. 20 Civ. 7033 (JPC), 2022 WL 4384000, at *5 n.5 (S.D.N.Y. Sept. 22, 2022) (finding sixth factor inapplicable because "there is no litigation at issue in this case that [the attorney] could have excluded ITGA from"); *Catizone v. Wolff*, 71 F. Supp. 2d 365, 371 (S.D.N.Y. 1999) (finding factor inapplicable for similar reasons); *cf. 6340 NB LLC v. Cap. One, N.A.*, No. 20 Civ. 02500 (JMA) (JMW), 2022 WL 17083292, at *5 (E.D.N.Y. Nov. 18, 2022) (the fact that "WMMD [counsel] did in fact exclude Capital One from some aspect of its representation to protect 6340 NB's interest" counseled against Capital One's disqualification motion because it "demonstrate[d] that there was a relationship between WMMD and 6340 NB that Capital One did not share").

Sixth and finally, even crediting O'Rear's claim to have believed that McLoughlin was representing her, such a belief would have been objectively unreasonable. McLoughlin did not explicitly or implicitly hold herself out as O'Rear's counsel; she did not offer O'Rear her legal services or give her legal advice; and she did not represent that she would be willing to serve as O'Rear's attorney. On the contrary, the communications before and during the call conveyed to O'Rear that McLoughlin was participating to assist *Green*, a human resources official from Merkley. Green stated that she and Cara Milligan—both Merkley representatives—had invited McLoughlin to join the meeting. And she told O'Rear that McLoughlin had been involved in prior investigations for Omnicom and Merkley.

Further, O'Rear's conduct during and after the meeting is inconsistent with a claim of a reasonable belief that McLoughlin was her counsel. O'Rear never said anything to that effect on the call. She never—on the call and afterwards—asked Green or McLoughlin for McLoughlin's contact information. She never followed up with McLoughlin. To be sure, the record leaves unresolved whether McLoughlin and/or Green expressly identified McLoughlin as corporate counsel—they attest that she did; O'Rear disputes the point; and the partial recording does not resolve the issue because it captures the call in midstream, after the point at which any such introduction most likely would have been made. But even if no express statement to that effect was made, the assembled circumstances did not make it reasonable for a person in O'Rear's position to conclude McLoughlin was serving as her personal counsel. *See, e.g.*, *Exact Invs. LLC v. Vesnaverboth*, No. 17 Civ. 6109 (DRH) (ARL), 2022 WL 17782087, at *4 (E.D.N.Y. July 18, 2022) ("The unilateral belief of a plaintiff alone does not confer upon him or her the status of a client."); *Calamar Enters., Inc. v. Blue Forest Land Grp., LLC*, 222 F. Supp. 3d 257, 264 (W.D.N.Y. 2016) ("Calamar's claims that it believed Phillips Lytle was continuously representing it since 2011–2012, even though no work was performed and no legal bills were rendered, is speculative and unsupported."); *Catizone*, 71 F. Supp. 2d at 371 (finding Catizone's belief that attorney Wolff was representing him not reasonable because "[t]here is no credible evidence that Wolff either affirmatively led Catizone to believe that he was acting as Catizone's attorney or knowingly allowed Catizone to proceed under that misconception").

O'Rear counters by emphasizing McLoughlin's reference on the call to "confidentiality" and her promise to try to limit dissemination of O'Rear's account out of respect for O'Rear's "privacy interests." Reply Mem. at 4. That argument does not carry the weight O'Rear assigns it. Critically, McLoughlin did not anywhere state that the information O'Rear provided would be

kept confidential from Merkley, O'Rear's adversary in this litigation. Any such claimed belief on O'Rear's part would be incredible, as Green was Merkley's executive director for human resources, and was on the call and heard the same account from O'Rear that McLoughlin did. Further, as reviewed above, both in their statements to O'Rear, and in Green's preceding email, McLoughlin and Green conveyed to O'Rear that disclosures of some of the substance of her statement (and possibly the statement in its entirety) would be made to others. O'Rear was even told that her account would be shared with Diaz, whom she accused of raping her. And O'Rear had requested a meeting with Green to share information about the assault specifically to enable Merkley to investigate and take appropriate action.

Viewed in this light, Green and McLoughlin's references to confidentiality can only reasonably be construed as promises to make any disclosures to others of O'Rear's account as limited as possible, consistent with the interests of the entity they served—Merkley. These interests centrally included determining whether and how to discipline Diaz and what accommodations if any to make to O'Rear's employment. The statements, for example, can be reasonably read as promising to be discreet within the workplace and not unduly to share with others the fact of this traumatic assault. The statements cannot, however, be read to promise O'Rear the wholesale confidentiality attendant to an attorney-client relationship. And in the end, McLoughlin did not learn any information on that call that Merkley—O'Rear's adversary—did not simultaneously learn.

Therefore, O'Rear's bid to disqualify McLoughlin based on the claim of an attorney-client relationship fails. A reasonable person could not find that any such relationship existed between O'Rear and McLoughlin. And McLoughlin did not acquire in her limited dealings with O'Rear any confidential information not equally known to her litigation adversary, Merkley.

This basis for disqualification thus fails. *See, e.g.*, *In re Methyl Tertiary Butyl Ether ("MTBE")
Prod. Liab. Litig.*, 438 F. Supp. 2d 305, 307–08 (S.D.N.Y. 2006) (denying disqualification
motion where there was no risk of trial taint because the attorney could not "benefit [her] client"
in the lawsuit at hand "by using confidential information about an adverse party obtained through
prior representation of that party"); *Wrubel v. John Hancock Life Ins. Co.*, No. 11 Civ. 1873
(WFK) (LB), 2012 WL 2251116, at *3 (E.D.N.Y. June 15, 2012) (holding that "even assuming
that an attorney-client relationship existed between Berman and the Trust, the instant record does
not reflect that it is likely that Berman had access to confidential information regarding the
Trust"); *Brown & Williamson Tobacco Corp. v. Pataki*, 152 F. Supp. 2d 276, 289 (S.D.N.Y.
2001) (denying disqualification motion because law firm "has demonstrated that there is no risk
of a lack of vigor or that confidential information will be used to the disadvantage of the State").

### 2.     **Failure to Provide *Upjohn* Warning**

O'Rear next faults McLoughlin, as counsel for Merkley, for not giving her a proper
*Upjohn* warning during the meeting.  An *Upjohn* warning is the notice an attorney (in-house or
outside counsel) conducting an internal investigation or a litigation is expected to "provide[] a
company employee to inform her that the attorney represents only the company and not the
employee individually."  *United States v. Connolly*, No. 16 CR. 0370 (CM), 2019 WL 2120523,
at *4 n.1 (S.D.N.Y. May 2, 2019).[7]  Along with that notification, the attorney is expected to
caution the employee that although the attorney-client privilege protects the communications
between counsel and the employee, the privilege is controlled solely by the company, and the

---

[7] The term originates with *Upjohn Co. v. United States*, 449 U.S. 383 (1981), in which the
Supreme Court held that the attorney-client privilege between the company and its attorney is
preserved when its attorney communicates with the company's employees, notwithstanding the
ordinary precept that communications between an attorney and a client in the presence of a third
party are not protected by attorney client privilege.

company may choose to waive the privilege and disclose what the employee told counsel to any third party, including the Government. *Id*.; *Parneros v. Barnes & Noble, Inc.*, 332 F.R.D. 482, 493–94 (S.D.N.Y. 2019) ("Interviews of a corporation's employees by its attorneys as part of an internal investigation into wrongdoing and potentially illegal conduct have been repeatedly found to be protected by the attorney-client privilege. . . . This protection was recognized in *Upjohn Co. v. United States*, 449 U.S. 383 (1981)." (internal citations and quotation marks omitted)).

It is undisputed that neither McLoughlin nor Green provided O'Rear with a classic *Upjohn* warning. But portions of the warning were conveyed. For the reasons reviewed above, it should have been evident to O'Rear that McLoughlin represented the company: McLoughlin attests that she identified herself as such; even putting that claim aside, the circumstances did not make it reasonable for O'Rear to conclude otherwise (*i.e.*, that McLoughlin represented O'Rear). Further, as reviewed above, both McLoughlin and Green communicated to O'Rear the possibility that Merkley, in its discretion, might disclose her account or excerpts of it to others, including Diaz. But neither McLoughlin nor Green claims to have alerted O'Rear of the company's full range of motion with respect to disclosing her statements, in the manner anticipated by *Upjohn*. And the recorded portion of the call supplied by O'Rear does not reflect such a warning, either.

O'Rear contends that McLoughlin, by failing to give a fully compliant *Upjohn* warning, breached Rule 1.13 of the New York Rules of Professional Conduct. Rule 1.13(a) states:

> When a lawyer employed or retained by an organization is dealing with the organization's directors, officers, employees, members, shareholders or other constituents, and it appears that the organization's interests may differ from those of the constituents with whom the lawyer is dealing, the lawyer shall explain that the lawyer is the lawyer for the organization and not for any of the constituents.

Disqualification is not required for any such lapse by McLoughlin.  McLoughlin's statements on the call, even by her account, fell short of delivering with ideal clarity the content required by Rule 1.13.  But although federal courts look to state disciplinary rules in considering disqualification motions, "such rules need not be rigidly applied as they merely provide general guidance."  *Mori v. Saito*, 785 F. Supp. 2d 427, 432 (S.D.N.Y. 2011) (internal citation and quotation marks omitted).  And, critical here, even a "violation of [these] rules may not warrant disqualification."  *GSI Com. Sols., Inc. v. BabyCenter, L.L.C.*, 618 F.3d 204, 209 (2d Cir. 2010).  Disqualification is instead warranted only if "an attorney's conduct tends to taint the underlying trial."  *Id.*

Here, the statements made on the call regarding McLoughlin's role and Merkley's ability to share O'Rear's account with others, viewed in totality, amounted at most to a technical violation of Rule 1.13.  Such a violation, if found, would not in any way affect or taint this litigation or a potential trial.  To the contrary, O'Rear was clearly on notice that her statements on the call could be shared with others, and she has not articulated any coherent argument why her interests in this litigation were harmed by any deviation on the call from Rule 1.13.  Nor has O'Rear cited any case in which a court has disqualified counsel based on a Rule 1.13 violation. "Given the availability of both federal and state comprehensive disciplinary machinery" to deal with such a violation, disqualification—which would separate corporate defendants from their chosen counsel—is not the appropriate sanction for McLoughlin's professional lapse.  *Bd. of Ed. of City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979); *see, e.g.*, *Metcalf v. Yale Univ.*, No. 15 Civ. 1696 (VAB), 2018 WL 6258607, at *4–6 (D. Conn. Nov. 30, 2018) (counsel's "inadvertent technical violation" of Connecticut Rule of Professional Conduct 4.2, whereby he contacted a party that he knew was represented by another attorney in the matter, did

not merit disqualification); *Ceramco, Inc. v. Lee Pharms.*, 510 F.2d 268, 269–71 (2d Cir. 1975)

(plaintiff's counsel telephoned defendants' employees without identifying himself as an attorney

in the matter in clear violation of Canon 7 of New York's Code of Professional Responsibility,

but this did not require disqualification; "while counsel's behavior is not to be commended, it is

not the kind of conduct which should result in disqualification of counsel or nullification of prior

proceeding").

### 3.    Witness-Advocate Rule

Next, O'Rear seeks to disqualify McLoughlin based on the witness-advocate rule as

embodied in New York Rule of Professional Conduct 3.7.  In relevant part, Rule 3.7(a) provides

that a "lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely

to be a witness on a significant issue of fact."  O'Rear argues that McLoughlin's participation on

the September 6 call and her involvement in the investigation of O'Rear's complaint renders her

an important fact witness at trial.  She contends that McLoughlin could testify as to: (1) what

O'Rear said during her interview with human resources about the sexual assault and sexual

harassment; and (2) Merkley's investigation, which Merkley may invoke in support of a potential

affirmative defense that it exercised reasonable care to prevent and correct sexual harassment by

employees like Diaz.

Although McLoughlin's disqualification may prove to be required if this case reaches

trial, the witness-advocate rule does not require her disqualification now.  Disqualification on the

basis of that rule is "triggered only when the attorney actually serves as an advocate before the

jury." *Finkel*, 740 F. Supp. 2d at 373.  And at the trial stage, if such a motion is renewed based

on McLoughlin's anticipated service as a witness, it would be germane which party intends to

call McLoughlin at trial.  Where the only party who proposes to call the attorney is the adversary

moving for disqualification, courts rightly review such motions with care and the claimed need

for the witness's testimony as potentially a tactical ploy. "[T]he movant must demonstrate both that the lawyer's testimony is 'necessary' and that there exists a 'substantial likelihood that the testimony would be prejudicial to the witness-advocate's client.'" *John Wiley & Sons*, 126 F. Supp. 3d at 420 (citing *Acker v. Wilger*, No. 12 Civ. 3620 (JMF), 2013 WL 1285435, at *1 (S.D.N.Y. Mar. 29, 2013)). Prejudice exists where the testimony would be "sufficiently adverse to the factual assertions or account of events offered on behalf of the client, such that the bar or the client might have an interest in the lawyer's independence in discrediting that testimony." *Lamborn v. Dittmer*, 873 F.2d 522, 531 (2d Cir. 1989).

McLoughlin's continued representation through discovery and anticipated summary judgment motions does not violate the witness-advocate rule because, during those junctures, no trial will be impending. The "witness-advocate rule is concerned with preventing potential taint *at trial*." *Ross v. Blister*, 09 Civ. 8666, 2009 WL 4907062, at *3 (S.D.N.Y. Dec. 21, 2009); *see also Ramey*, 378 F.3d at 282 ("The advocate-witness rule applies, first and foremost, where the attorney representing the client *before a jury* seeks to serve as a fact witness *in that very proceeding*." (emphasis added)). The case is in an early stage of litigation. The parties had paused motions practice for several months to attempt to attain a settlement; the Court has recently granted a motion to extend fact discovery until late December; and defendants' motions to dismiss have not been fully briefed. Any trial is far away. And it is conjecture to posit that McLoughlin will necessarily be a fact witness at a trial, such that the concerns of trial taint and jury confusion that underlie the witness-advocate would come into play.[8] At this stage, "it is impossible to determine how significant [McLoughlin] might be as a witness or whether [s]he is

---

[8] O'Rear's representation that she plans to depose McLoughlin is irrelevant. The witness-advocate rule is concerned solely with an attorney acting as a witness at *trial*.

likely even to be called as a witness; whether h[er] testimony would likely hurt or help h[er] client; or whether h[er] testimony would or would not be cumulative of other witnesses." *Prout v. Vladeck*, 316 F. Supp. 3d 784, 810 (S.D.N.Y. 2018); *see, e.g.*, *id.* ("Here, where there is no record on which to base a disqualification motion, the Court cannot determine with sufficient certainty that defendants have borne their 'high burden' to show that [the attorney's] testimony will be necessary at trial or that the content of that testimony is likely to be prejudicial."); *Gabayzadeh v. Taylor*, 639 F. Supp. 2d 298, 304 (E.D.N.Y. 2009) (denying motion to disqualify where determination "would be merely speculative at this point" in litigation); *Rosefield v. Orentreich,* No. 98 Civ. 2721 (TPG), 1998 WL 567750, at *5–6 (S.D.N.Y. Sept. 4, 1998) (denying motion to disqualify where it was not clear that case would proceed to trial or that counsel would be called to testify; "too much remains unknown").

Moreover, even if it were not premature to resolve this question, O'Rear's argument that McLoughlin's trial testimony will be necessary is thus far unconvincing. To the extent that O'Rear posits that she would call McLoughlin to recount what O'Rear said during the September 6, 2023 call, there is another participant to that call (Green) and a tape recording of the bulk of that call. As of today, O'Rear has not established that McLoughlin "would be the only available witness[] on this topic." *Finkel*, 740 F. Supp. 2d at 375. Her testimony as to the call has the potential to be "merely cumulative." *Id.*; *see, e.g.*, *Solow v. Conseco, Inc.*, 06 Civ 5988 (BSJ) (THK), 2007 WL 1599151, at *4 (S.D.N.Y. June 4, 2007) ("The rule requires that a lawyer's testimony be necessary, not simply that it be the best evidence, and to that end, courts deem a lawyer's testimony necessary only if there [are] no other witnesses to the circumstances at issue." (internal quotation marks omitted)); *Shabbir v. Pak. Int'l Airlines*, 443 F. Supp. 2d 299, 308 (E.D.N.Y. 2005) ("[A] lawyer who could provide only cumulative testimony may act as trial

counsel."); *Kubin*, 801 F. Supp. at 1113 ("[A]n attorney whose testimony would merely corroborate the testimony of others may not be subject to disqualification.").

O'Rear's contention that McLoughlin may need to testify at trial in support of a defense by Merkley that it had in place adequate safeguards against sexual harassment and appropriately investigated O'Rear's complaint has clear potential to require McLoughlin's disqualification. But a threshold issue would be whether the corporate defendants intend to raise the *Faragher-Ellerth* affirmative defense, under which an employer may "avoid vicarious liability in a hostile environment case by pleading and proving that it exercised reasonable care to promptly prevent and correct any harassing behavior and that the employee unreasonably failed to take advantage of the preventive or corrective opportunities provided by the employer." *United States ex rel. Ortiz v. Mount Sinai Hosp.*, 185 F. Supp. 3d 383, 391 n.3 (S.D.N.Y. 2016). It is not clear yet whether they will do so.[9] If they do, an important factor in evaluating a disqualification motion on this ground would be the role played by McLoughlin and her law firm in such efforts. Green's statement on the call lends initial support to O'Rear's claim that McLoughlin was a central advisor to Merkley on such issues, but a deeper factual assessment would unavoidably be necessary. And although O'Rear claims that McLoughlin led Merkley's post-call investigation of her sexual assault report, Pl. Mem. at 3, corporate defendants deny that, contending that McLoughlin attended the interviews of O'Rear and Diaz but not of the other six witnesses. *See* Def. Opp. at 8 ("Attorney McLoughlin *did not* lead Merkley's investigation into Plaintiff's report of sexual assault."). More information about McLoughlin's role will be needed to reliably assess any such motion.

---

[9] The corporate defendants' motion to dismiss is pending. They have not yet had occasion to file an Answer specifying affirmative defenses.

More broadly, McLoughlin's involvement in Merkley's compliance program and/or the investigation into O'Rear's assault complaint may not make her a *necessary* witness. As potentially instructive authority, in *Doe v. Polise Consulting Engineers, D.P.C.*, 2021 U.S. Dist. LEXIS 192078, 21 Civ. 609 (CM) (S.D.N.Y. Oct. 5, 2021), Judge McMahon was presented with a similar motion, made mid-discovery, based on an attorney's participation in the investigation of her claims. The plaintiff there sought to disqualify an attorney, Blumetti, who had interviewed her in connection with an investigation by her former employer into her claim of sexual assault and harassment. The plaintiff termed Blumetti's testimony "the only way that [the company] can prove that it exercised reasonable care to prevent and promptly correct any harassing behavior, as asserted in the Answer." *Id.* at *8 (internal quotation marks omitted). Judge McMahon denied the motion:

> [W]hile Plaintiff may be correct that the best and most convincing way for Defendant to prove that it exercised reasonable care would be for Blumetti to get on the witness stand and explain to the jury how he conducted his investigation, she is wrong to insist that it is the only way for Defendant PCE to prove its case. PCE witnesses can testify to the *fact* that the employer initiated an investigation in the incident with Burns, and can also testify to the *fact* that Burns was fired as a result of the investigation. From those two facts, PCE can argue that it exercised reasonable care to correct the harassing behavior.

*Id.* at * 9–10. Here, McLoughlin's role in the investigation may or may not prove akin to that of Blumetti's. And her role in Merkley's relevant compliance efforts may or may not make her testimony necessary. A full record is needed to ascertain whether the facts germane to the affirmative defense can be developed without her testimony. *See, e.g.*, *Donatello v. Cnty. of Niagara*, No. 15 Civ. 39A, 2015 WL 8328845, at *4 (W.D.N.Y. Dec. 7, 2015) (rejecting as premature argument that law firm should be disqualified on the ground that firm attorneys would be important fact witnesses to an *Faragher-Ellerth* affirmative defense based on their conduct of the internal investigation into plaintiff's sex-based discrimination claims; it was "too soon to

tell" whether information counsel learned in investigation would be necessary "until the case takes further shape during discovery"); *Doe #1 v. Am. Fed'n of Gov't Emps.*, 554 F. Supp. 3d 75, 91 (D.D.C. 2021) (rejecting as legally unsupported claim that Bredhoff & Kaiser's should be disqualified as defense counsel because defendants had retained the firm to investigate plaintiff's internal complaints).

The Court accordingly denies O'Rear's motion to disqualify McLoughlin. The denial is without prejudice to O'Rear's right, after resolution of summary judgment motions and on a schedule to be set by the Court, to move anew for McLoughlin's disqualification at trial based on the witness-advocate rule.

### B. Motion to Disqualify Davis & Gilbert Law Firm

O'Rear also moves to disqualify Davis & Gilbert—McLoughlin's law firm. O'Rear's arguments to this end are meritless, to the point that they border on frivolous.

First, O'Rear declares that Omnicom uses Davis & Gilbert "in an externalized human resources function" and that the law firm "directly controls—from time to time—employment decisions" of Omnicom and its subsidiaries, including Merkley. Pl. Mem. at 8. As such, she argues that Davis & Gilbert "is directly implicated in the Complaint, and therefore cannot serve as litigation counsel." *Id.* at 9. O'Rear has not provided any factual support for these sweeping and improbable factual contentions, let alone concrete evidence meeting the "high standard of proof" required for disqualification motions. *Evans*, 715 F.2d at 791. Her motion cites only conclusory allegations in her Complaint. *See* Pl. Mem at 8 (citing Compl. ¶¶ 67–70), 9 (citing Compl. ¶¶ 67–73). And the corporate defendants dispute these factual claims. *See* Def. Opp. at 29–30. O'Rear's threadbare showing, consisting of generalized accusations and lamentations, falls far short of supporting relief. *See, e.g.*, *Sea Tow Int'l, Inc. v. Pontin*, No. 06 Civ. 3461 (SJF) (ETB), 2007 WL 4180679, at *6 (E.D.N.Y. Nov. 19, 2007) (denying motion to disqualify

because plaintiff's "conclusory assertions amount to nothing more than sheer speculation as to the existence of a conflict of interest" and "such assertions merely bolster the argument that this motion is being made solely to achieve a strategic advantage in this litigation"); *Bulkmatic Transp. Co. v. Pappas*, No. 99 Civ.12070 (RMB) (JCF), 2001 WL 504841, at *2 (S.D.N.Y. May 11, 2001) (defendants' assertions that law firm's continued representation of plaintiff and third-party defendants is likely to create a conflict of interest "are too vague and conclusory to meet the heightened burden of proof required for a motion to disqualify"); *Reyes v. Golden Krust Caribbean Bakery, Inc*., No. 15 Civ. 7127 (DF), 2016 WL 4708953, at *13 (S.D.N.Y. Sept. 1, 2016) (denying motion to disqualify based on alleged conflict of interest where arguments "rests on nothing more than unsupported speculation").

Next, O'Rear argues that Davis & Gilbert should be disqualified based on its association with McLoughlin. Pl. Mem. at 9. With the Court having denied O'Rear's motion to disqualify McLoughlin, this derivative motion necessarily fails.

The Court thus denies O'Rear's motion to disqualify Davis & Gilbert. The denial is without prejudice to O'Rear's right to argue later that, if McLoughlin is disqualified on the basis of the witness-advocate rule, the disqualification should extend to the entire law firm.

## CONCLUSION

The Court denies O'Rear's motions to disqualify. The Clerk of the Court is respectfully directed to terminate the motions pending at Dockets 17 and 28.

SO ORDERED.

_Paul A. Engelmayer_

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: August 29, 2024
      New York, New York