UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

S. O'REAR,

                                        Plaintiff,

                    -v-

ARMANDO DIAZ *et al.*,

                                        Defendants.

24 Civ. 1669

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

This case involves a claim by an employee of an advertising firm of a rape by a coworker for which the firm is legally liable. Plaintiff S. O'Rear sues her employer Merkley + Partners Inc. ("Merkley"), Merkley's parent company, Omnicom Group Inc. ("Omnicom") (collectively, the "corporate defendants"), and individual defendant Armando Diaz (together, the "defendants"). She alleges that, after a holiday happy hour, Diaz, Merkley's creative director, sexually assaulted and raped her. O'Rear brings, against the corporate defendants, claims of sexual harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and negligent supervision under New York state law. She brings, against all defendants, claims of sexual battery under New York state law, gender motivated violence under the Gender Motivated Violence Protection Act, N.Y.C. Admin. Code § 10-1101 *et seq.* ("GMVPA"), and sexual harassment under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-502(a) *et seq.* ("NYCHRL").

1

Defendants, in separate motions, move to dismiss under Federal Rule of Civil Procedure 12(b)(6).[1] O'Rear separately moves for sanctions against Diaz under Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927. For the reasons that follow, the Court grants the corporate defendants' motion to dismiss, which is directed to three of the five claims against them; denies Diaz's motion to dismiss in its entirety; and denies O'Rear's motion for sanctions.

## I.    Background[2]

### A.    Factual Background

#### 1.    The Parties

Merkley is a midsized advertising firm incorporated and headquartered in New York. AC ¶ 4. Omnicom is a global media and advertising firm also incorporated and headquartered in New York. *Id.* ¶ 5. Merkley is a wholly owned subsidiary of Omnicom. *Id.* ¶ 4. Omnicom had the authority to appoint and control Merkley's board of directors and executives. *Id.* ¶ 60.

---

[1] For the reasons discussed, *see infra* Part I.B, the Court construes Diaz's premature Rule 12(c) motion as if brought under Rule 12(b). *See* Wright & Miller, Federal Practice and Procedure § 1368 (3d ed.) ("Because of the similarity between the Rule 12(c) and Rule 12(b) standards, courts typically will construe a premature Rule 12(c) motion[] as if it were brought under Rule 12(b) and a late Rule 12(b) motion . . . as if it were brought under Rule 12(c)."); *see also* Dkt. 63 (letter from Diaz, asking that his premature Rule 12(c) motion for judgment on the pleadings be treated as an untimely Rule 12(b)(6) motion to dismiss).

[2] This account is drawn from the Amended Complaint, Dkt. 40, ("AC") and the parties' submissions on the pending motions. These include the corporate defendants' memorandum of law, Dkt. 55 ("Corp. Defs. Br."); the declaration of Angela Dunay, Dkt. 56 ("Dunay Decl."), in support of corporate defendants' motion; Diaz's memorandum of law, Dkt. 59 ("Diaz Br."); the declaration of Jeffrey Chabrowe, Dkt. 60 ("Chabrowe Decl.") in support of Diaz's motion; plaintiff's opposition to Diaz's motion, Dkt. 79 ("Pl. Diaz Opp."); plaintiff's opposition to corporate defendants' motion, Dkt. 83 ("Pl. Corp. Defs. Opp."); the declaration of Joshua Bernstein, Dkt. 84 ("Bernstein Decl."), in support of plaintiff's opposition to corporate defendants' motion; corporate defendants' reply, Dkt. 89 ("Corp. Defs. Reply"); Diaz's reply, Dkt. 90 ("Diaz Reply"); and the supplemental declaration of Chabrowe, Dkt. 96 ("Chabrowe Supp. Decl."), in support of Diaz's reply.

Diaz is a New Jersey resident who, until late 2023, worked as a creative director for Merkley. *Id.* ¶¶ 3, 50, 84.

O'Rear is a New York resident who, since February 2022, has worked as a social media strategist for Merkley. *Id.* ¶¶ 2, 9.

### 2.    The Sexual Assault

On December 15, 2022, Merkley hosted a holiday happy hour for its employees. *Id.* ¶ 10. At the happy hour, O'Rear had several drinks with coworkers, including Diaz. *Id.* Afterwards, O'Rear and a group of coworkers moved to a different bar, where Diaz bought multiple rounds of drinks for the group. *Id.* ¶ 11. As the night progressed, O'Rear became intoxicated to the point of blacking out. *Id.* ¶ 15. Late in the night, O'Rear stated she needed to take the subway to get home. *Id.* Diaz offered to walk her to the subway station. *Id.* However, instead of doing so, Diaz directed O'Rear to Merkley's office. *Id.* ¶ 16. At this point, O'Rear alleges, she "was fully blacked out." *Id.* Diaz took O'Rear to a bathroom near a Merkley conference room. *Id.* ¶ 17. The last thing she remembers from that night is that Diaz "had his penis out of his pants," and that she refused to engage in oral sex. *Id.* She woke up the next morning "with no recollection of how she got home." *Id.*

Initially, O'Rear "believed no sexual activity had taken place" between her and Diaz. *Id.* ¶ 18. However, on May 4, 2023, O'Rear learned from Diaz that the two had engaged in penetrative sex on December 15. *Id.* ¶ 29. O'Rear alleges that the sexual encounter was not consensual on her part because she had been too intoxicated to consent. *Id.* ¶ 15. She therefore alleges that Diaz sexually assaulted and raped her that night. *See, e.g., id.* ¶ 17.

### 3.    Merkley's Ensuing Internal Investigation

On July 25, 2023, O'Rear disclosed to a higher-up at the company—Jennifer Cimmino—that she had been sexually assaulted by a senior member of Merkley's leadership team and no

longer felt comfortable coming into the office. *Id.* ¶¶ 35, 39, 43. The next day, Rebecca Green,[3] an executive director of human resources ("HR"), emailed O'Rear, asking if she had time to discuss her report. *Id.* ¶ 46. O'Rear responded, posing questions about the investigation process, which Green answered. *Id.* A week later, Green followed up about the report and next steps. *Id.*

On August 18, 2023, O'Rear replied that she was "not ready to participate in an investigation." *Id.* ¶ 47. She also asked that Green "stop asking her to participate in an investigation until [she] reached out to communicate what next steps she would like to take." *Id.*

On August 31, 2023, O'Rear sent Green a formal report recounting her sexual assault, plus corroborative text messages. *Id.* ¶ 48. On October 2, 2023, O'Rear had a call with Green. *Id.* ¶ 49. During the call, Green stated that Merkley had intended to terminate Diaz, but that he had been "tipped off" and "resigned in advance." *Id.* Over email the next day, Green explained that Diaz would continue working until the end of the month or November 8 at the latest. *Id.* ¶ 50. O'Rear next requested Merkley's investigation documents regarding the reported assault, which Green refused to produce. *Id.* ¶ 51.

**B.    Procedural History**

On March 5, 2024, O'Rear filed the Complaint. Dkt. 1. On April 5, 2024, the corporate defendants moved to dismiss under Rule 12(b)(6). Dkts. 32–34. On April 9, 2024, the Court directed O'Rear to file any amended complaint or opposition to the motion by April 26, 2025. Dkt. 36. On April 12, 2024, Diaz answered the Complaint. Dkt. 38. On April 25, 2024, O'Rear filed the AC. Dkt. 40.

---

[3] Rebecca Green is identified in the AC and other papers filed by O'Rear as "Rebecca Lax." Her declaration states that her last name today is "Green." *See* Dkt. 27 at 1 n.1.

After two extensions, on July 31, 2024, the corporate defendants moved to dismiss the AC pursuant to Rule 12(b)(6), Dkt. 54, and filed a supporting memorandum of law, Dkt. 55, and a declaration with attached exhibits, Dkt. 56.

On August 1, 2024, Diaz moved for judgment on the pleadings under Rule 12(c), Dkt. 58, and filed a supporting memorandum of law, Dkt. 59, and a declaration, Dkt. 60. That day, O'Rear filed a letter motion asking that Diaz's motion be denied as procedurally improper because the pleadings were not technically closed. Dkt. 61; *see* Fed. R. Civ. P. 12(c) ("After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."). In response, on August 6, 2024, Diaz asked the Court to treat his premature motion for judgment on the pleadings as a motion to dismiss because the standards for these are identical. Dkt. 63. By order on August 16, 2024, the Court agreed to do so. Dkt. 66. But, recognizing that doing so denied O'Rear an opportunity to amend her Complaint in response to Diaz's motion to dismiss, the Court gave O'Rear an additional opportunity to amend, solely for the purpose of responding to Diaz's motion, by September 6, 2024. *Id.* O'Rear, however, did not further amend the AC.

On October 10, 2024, O'Rear filed an opposition to Diaz's motion to dismiss, Dkt. 79, and a declaration, Dkt. 78. On October 14, 2024, O'Rear filed an opposition to the corporate defendants' motion to dismiss, Dkt. 83, and a declaration with annexed exhibits, Dkt. 84. On October 28, 2024, the corporate defendants replied. Dkt. 89. The next day, Diaz replied, Dkt. 90, and filed a supplemental declaration with annexed exhibits, Dkt. 96.

## II.    Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. For the purpose of resolving the motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

**III.    Motions to Dismiss**

Two motions to dismiss are pending. The corporate defendants move to dismiss the sexual battery and gender-motivated violence claims as brought against them, on the grounds that, as pled, Diaz's alleged actions did not occur within the scope of his employment and the corporate defendants did not enable those acts. Corp. Defs. Br. at 8–11. They also move against the state-law claim of negligent supervision, arguing that it is barred by New York Workers' Compensation Law, N.Y. Workers' Comp. Law § 29(6), and that, as pled, they did not know, and should not have known, of Diaz's alleged propensity for sexual assault or harassment, Corp. Defs. Br. at 4–7. They do not move against the remaining two claims. Diaz moves to dismiss all claims against him, on the factual grounds that O'Rear either consented to penetrative sex with him or that, if not, Diaz could not have known of O'Rear's inability to consent. Diaz Br. at 8–11.

The ensuing discussion evaluates each challenged claim separately. As explained, the Court denies Diaz's motion in its entirety because, contrary to his portrait of the AC, the AC plausibly pleads that O'Rear did not consent to Diaz's sexual advances and could not have done

6

so while unconscious, and that Diaz knew of O'Rear's incapacitation. The Court grants the corporate defendants' motion to dismiss in its entirety, because the AC does not plead facts sufficient to establish that these defendants ratified, acquiesced, facilitated, knew, or should have known of Diaz's unlawful conduct or propensity for such.

### A.    Sexual Battery Claim

Under New York law, a "'battery' is an intentional wrongful physical contact with another person without consent." *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001) (quoting *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993)). "In the civil context," the common meaning of "'battery' subsume[s] all forms of tortious menacing and unwanted touching." *United Nat'l Ins.*, 994 F.2d at 108. "Rape and sexual assault are, by definition, actions taken against the victim without the victim's consent." *Breest v. Haggis*, 180 A.D.3d 83, 94 (1st Dep't 2019). Thus, "a rape is an undisputed . . . battery" under New York law. *United Nat'l Ins.*, 994 F.2d at 108 (citation omitted).

### 1.    Diaz

In moving to dismiss the sexual battery claim, Diaz argues that the AC does not plead either that (1) O'Rear did not consent to the sexual encounter, or (2) Diaz was unaware that she was incapable of consenting. Diaz Br. at 8–9. That is wrong. The AC plausibly pleads each, and either would support the claim.

The AC explicitly alleges that O'Rear "declined to engage in oral sex when she came-to," meaning that between O'Rear's bouts of unconsciousness, and before the alleged sexual contact occurred, she communicated to Diaz that she did not consent to sexual touching. AC ¶ 17. That factual allegation must be credited on the pleadings. *See Iqbal*, 556 U.S. at 678 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting *Twombly*, 550 U.S. at 570)); *Koch*, 699

7

F.3d at 145 (court must "accept as true" all well-pled factual allegations in the complaint, and "draw[] all inferences in the plaintiff's favor"). And the AC is devoid of contrary allegations, to wit, allegations that O'Rear at any point expressed consent. The AC adequately pleads that she conveyed to Diaz a lack of consent.

The AC also contains numerous allegations that O'Rear was too inebriated to be taken as silently consenting to sex. It alleges, as noted, that O'Rear blacked out and "came-to." AC ¶ 17. And it alleges that Diaz was aware that O'Rear was too inebriated to consent. He had personally "plie[d]" O'Rear with "copious" amounts of alcohol, *id.* at 1, 3, and "offered to walk her to the train," *id.* ¶ 15, "because of her state of advanced intoxication," *id.* ¶ 16. The AC also pleads that a coworker overheard O'Rear tell Diaz she needed to head home given her inebriation, and that, in response, Diaz offered to help her reach the train station. *Id.* ¶ 15. O'Rear's contemporaneous text messages—which Diaz attached to his supplemental declaration and which the parties agree the AC incorporates—accord with the AC's allegation of O'Rear's incapacitation. *See* Dkt. 96-2 ("O'Rear Texts") at 2, 6 ("wasted"; "i'm drunk"; "i'm so drunk"; "BADDDDD"; "i was sooooo drunk"). Finally evincing O'Rear's inability to consent, after she expressly declined oral sex, she "slipped back into unconsciousness[.]" *Id.* ¶ 17. Notwithstanding this, it alleges, "[i]nstead of walking Ms. O'Rear to the train, Diaz redirected [her] back to the Merkley + Partners office," where he raped her. *Id.* ¶ 16.

In moving to dismiss this claim, Diaz urges an alternative inference. He argues that, because the AC alleges that O'Rear recalled portions of the events of the night or that O'Rear was capable of performing certain acts consciously, the AC contains contradictory allegations about O'Rear's ability to consent, and the Court should set these allegations aside. Diaz Br. at 8–9. That is wrong. The AC's narrative is of a woman on the brink of consciousness who at one

point conveyed non-consent, and at all times conveyed impairment to a degree that consent could not be inferred. There is nothing implausible about that portrait. And courts applying New York law have routinely sustained claims of sexual battery under circumstances where, as alleged, the plaintiff, due to intoxication, fell in and out of consciousness during the allegedly unconsented-to sexual contact. *See e.g.*, *Gavel v. Korang*, No. 20 Civ. 3475, 2024 WL 4203732, at *5 (S.D.N.Y. Aug. 28, 2024), *R. & R. adopted*, No. 20 Civ. 3475, 2024 WL 4203248 (S.D.N.Y. Sept. 16, 2024) ("Under New York law, Plaintiff's allegation that [defendant] 'forced' her to have intercourse while she was drunk suffices to state claims for civil battery and assault."); *Doe v. AR*, No. 21 Civ. 6353, 2022 WL 1624081, at *10 (W.D.N.Y. May 23, 2022) (sustaining claims for battery and assault of plaintiff who lacked consciousness due to intoxication); *see also Doe v. Hyassat*, No. 18 Civ. 6110, 2024 WL 1955354, at *4 (S.D.N.Y. May 3, 2024) (sustaining claims for battery and assault where defendant drugged plaintiff and engaged in intercourse while plaintiff was "unconscious and incapable of consent").

At trial, Diaz will be at liberty to impeach O'Rear's version of events, and/or to argue that the evidence in full, including her version, is consistent with her consent or his genuine perception that she consented to sex. But the AC does not plead that. And contrary to Diaz's depiction, the factual allegations in the AC are fully consistent with both theories under which O'Rear's sexual battery claim could prevail: that she expressly declined consent, and that she was demonstrably incapacitated. AC ¶¶ 16–17. That O'Rear recalls refusing to participate in oral sex, *id.* ¶ 17, is a fact that a fact-finder could credit notwithstanding her inability to recall other events of the night in question. That O'Rear had an incomplete memory of the events of that night, *see id.*, is a fact that a fact-finder could find to support her claim of inebriation to the point of incapacitation. And Diaz's portrait of O'Rear's account does not credit, as it must on a

9

Rule 12(b)(6) motion, the AC's well-pled allegations supporting her claim. *See Iqbal*, 556 U.S. at 678; *Koch*, 699 F.3d at 145. These include that, before any sexual contact, O'Rear "became intoxicated to the point of blacking out, well beyond the capacity of consent," *id.* ¶ 15; that she later "came-to in a toilet stall in the women's bathroom . . . with Diaz, who had his penis out of his pants," *id.* ¶ 17; that after "declin[ing] to engage in oral sex," O'Rear again slipped into unconsciousness, *id.* ¶¶ 17–18, without any memory of contact beyond consensual kissing, O'Rear Texts at 5–6 ("we made out" but "I like don't remember most of it"); and that she "believed no sexual activity had taken place," AC ¶¶ 17–18. And, contrary to Diaz's argument, O'Rear's contemporaneous text messages are compatible with the AC. They accord with the AC's claims that O'Rear was intoxicated, *see id.* ¶ 19 (O'Rear was "wasted" and "so drunk"); that she did not believe that touching beyond kissing occurred, *see id.* ¶ 21 ("[W]e just made out and almost did more but we stopped ourselves," "but like his dick was out[.]"); and that she had bouts of consciousness, *see* O'Rear Texts at 6 ("I literally don't remember[.]"). Finally, although Diaz will be free to contest the point at trial, a finder of fact could find O'Rear's ability to "get herself home" and "text[] friends about her experience" compatible with her claim to have been in and out of consciousness during the events at issue. Diaz Br. at 8.

Diaz also errs in arguing that the AC's allegations as to later events so undermine its theory as to make the sexual battery claim implausible. These accord with its central theories that O'Rear did not consent to sex, and that Diaz appreciated her impairment in real time. The AC alleges that, months later, when O'Rear asked Diaz about the incident, he "responded by laughing and asking" whether O'Rear recalled the events. AC ¶ 29. It alleges that, after O'Rear stated that her last memory was "not going down on [Diaz]," Diaz replied, "We did everything— you went down on me, I went down on you, we had sex." *Id.* The AC alleges that O'Rear was

stunned by this revelation—and asked whether there was any surveillance of the area, to which Diaz responded, "There are no cameras by that bathroom." *Id.* These allegations accord with the AC's claim that O'Rear had been incapacitated during the sexual encounter and that Diaz appreciated that fact. And O'Rear's text messages and in-person discussions accord with the AC's claim that she first learned that Diaz had penetrated her months afterwards. *See id.* ¶ 30 ("[I]'m bugging a little bit, remember, months ago when [I] got really drunk and hooked up w[ith] my married coworker, he reminded me tonight we literally 'did everything.'"); *id.* ("[I] was so blackout that the last thing [I] remember is refusing to suck his dick."); *id.* ¶ 31 ("I just have to say this to someone because I'm freaking out but Armando [Diaz] took advantage of me after the holiday party.").

The AC viably pleads sexual battery by Diaz. The Court therefore denies his motion to dismiss that claim.

### 2.    Corporate Defendants

The AC also claims sexual battery by the corporate defendants, alleging that these entities authorized and ratified Diaz's rape by continuing to employ him after their investigation found that he had sexually assaulted O'Rear. *Id.* ¶ 76. In moving to dismiss, the corporate defendants do not dispute the adequacy of the AC's pleading of sexual battery by Diaz. They argue instead that the facts pled do not support that the assault fell within the scope of Diaz's employment or was done in furtherance of their interests. Corp. Defs. Br. at 9–10. Thus, they argue, they cannot be vicariously liable under respondeat superior. *Id.*; *see Doe v. Alsaud*, 12 F. Supp. 3d 674, 677 (S.D.N.Y. 2014) ("New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context." (citation omitted)). O'Rear, notably, does not seriously contest these points. But she argues that the corporate defendants may be held

11

liable for Diaz's sexual battery either because (1) they, allegedly, later ratified or acquiesced in

his misconduct, or (2) their culpability for the sexual battery act can be imputed from Diaz's

senior role. *See* Pl. Corp. Defs. Opp. at 6–10.  The Court addresses these arguments in turn.

"New York courts and the Second Circuit ordinarily analyze ratification under New York

law by relying on general principles of the common law of agency, including those set forth in

the Restatement (Second) of Agency." *Doe 7015 v. Elektra Ent. Grp. Inc.*, No. 21 Civ. 6868,

2023 WL 2744102, at *5 (S.D.N.Y. Mar. 31, 2023) (citing *Hamm v. United States*, 483 F.3d 135,

140 (2d Cir. 2007) and *Standard Funding Corp. v. Lewitt*, 89 N.Y.2d 546, 552 (N.Y. 1997)).

The Restatement defines ratification as the "affirmance by a person of a prior act which did not

bind him but which was done or professedly done on his account, whereby the act, as to some or

all persons, is given effect as if originally authorized by him."  Restatement (Second) of Agency

§ 82; *accord Hamm*, 483 F.3d 135 (quoting that rule); Black's Law Dictionary 1289 (12th ed.

2024) (defining "ratification" as, *inter alia*, "[c]onfirmation and acceptance of a previous act,

thereby making the act valid from the moment it was done").  Ratification can also be

established by "failing to repudiate" employee misconduct done on the employer's behalf.  *See*

*LaBozzo v. Brooks Bros.*, 2002 WL 1275155, at *4 (N.Y. Sup. Ct. Apr. 25, 2002) (ratification

could establish employer liability due to an executive's failure to "repudiate [acts] on [the

employer's] behalf").

Acquiescence, in turn, is premised on an employer's knowledge of employee misconduct

and its failure to provide corrective action. *See, e.g., O'Reilly v. Executone of Albany, Inc.*, 121

A.D.2d 772, 773–74 (3d Dep't 1986) (upholding sexual battery claims as to employer who "had

knowledge of such battery by virtue of [employee's] complaints but refused to take any

corrective or remedial action, thereby acquiescing in said battery"); *Spoon v. Am. Agriculturalist,*

*Inc.*, 120 A.D.2d 857, 858–60 (3d Dep't 1986) (reversing dismissal of sexual harassment claim attributed to employer who "had knowledge of and acquiesced in the discriminatory conduct of its employee"); *see also* Black's Law Dictionary 1289 (12th ed. 2024) (defining "acquiescence" as, *inter alia*, "tacit or passive acceptance; implied consent to an act"). Knowledge can be established directly, including through an employee's complaints, *see Sutherland v. Roman Cath. Diocese of Rochester*, 39 A.D.3d 1151, 1152 (4th Dep't 2007), or constructively, as when sexual harassment is pervasive throughout the workplace, *cf. Vitale v. Rosina Food Prods. Inc.*, 283 A.D.2d 141, 143 (4th Dep't 2001) ("In order to hold a defendant liable under New York law for alleged pervasive harassment, a plaintiff must prove that the employer had knowledge of and acquiesced in the discriminatory conduct of its employee." (cleaned up)). Where such is shown, to refute an acquiescence claim, an employer must demonstrate it "took immediate and adequate measures to ensure that the alleged offensive behavior would cease." *Sutherland*, 39 A.D.3d at 1152 (quoting *Pace v. Ogden Servs. Corp.*, 257 A.D.2d 101, 103–104 (3d Dep't 1999)).

The AC here does not plead facts plausibly alleging the corporate defendants' ratification of Diaz's sexual battery. It alleges that Diaz was "an open and notorious sexual harasser long before his sexual assault of Ms. O'Rear," AC ¶ 53, and "a serial sexual predator whom young female employees are warned about early in their tenure," *id.* at 1. It pleads that Diaz was "known for making outrageous sexual comments about female employees in group meetings, being overtly 'flirtatious,'" and even "flash[ing] his naked body on a video call with another female employee." *Id.* Diaz is also alleged, before the rape, to have shown O'Rear "a photo of himself shirtless," *id.* ¶ 11, told her that "[i]f [she] were wearing a beret, [Diaz] would fuck [her] right now," *id.* ¶ 12, and "grop[ed] one of Ms. O'Rear's colleagues," *id.* ¶ 13. None of these acts, however, is alleged, or plausibly could be alleged, to have been performed on the corporate

defendants' behalf. That precludes a claim of ratification. *See, e.g.*, *Elektra Ent. Grp. Inc.*, 2023 WL 2744102, at \*5 ("[B]ecause the Amended Complaint does not allege that [employee] himself intended or purported to act for the [corporate defendants] when he engaged in sexual contact with Plaintiff, it has not adequately pled that [they] ratified his sexual battery."); *Canosa v. Ziff*, No. 18 Civ. 4115 (PAE), 2019 WL 498865, at \*14 (S.D.N.Y. Jan. 28, 2019) (dismissing sexual battery claim under California law because complaint did "not allege[], other than conclusorily, that when [employee] attacked [plaintiff], he was acting on anyone's behalf other himself").

The AC's allegations also fail to plead the corporate defendants' acquiescence. It does not plead that these defendants knew or had direct or constructive knowledge of Diaz's sexual assault until more than seven months afterwards—when O'Rear notified Cimmino of the assault. AC ¶¶ 35, 38–43. To the extent the AC attempts to plead the corporate defendants' prior knowledge of misconduct by Diaz, these allegations do not concern sexual assault, but of sexual harassment, a different wrong. *See id.* ¶ 53. Even as to Diaz's sexual harassment, however, the AC insufficiently pleads the corporate defendants' knowledge. It does not allege that, before O'Rear's sexual assault, the corporate defendants had received complaints of Diaz's sexual harassment, or that senior-level employees witnessed or knew of such. Apart from conclusory allegations that Diaz was "an open and notorious sexual harasser long before his sexual assault of Ms. O'Rear," *id.* ¶ 53, the AC does not plead that the corporate defendants had constructive knowledge of Diaz's sexual harassment. *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true.").

Even if knowledge were properly alleged, however, the AC does not plead any delay by the corporate defendants in corrective action. As pled, once informed of O'Rear's sexual assault,

14

the corporate defendants quickly investigated her complaint, *id.* ¶¶ 39–41, 43, 45–48, and decided about a month later to terminate Diaz, *id.* ¶¶ 49–50. On July 26 2023, the day after O'Rear, on July 25, 2023, disclosed to Cimmino her assault by a senior-level employee, a member of Merkley's HR department spoke with O'Rear. *Id.* ¶¶ 35, 38–43, 46. These communications continued [o]ver the following months," *see id.* ¶¶ 46–47, until O'Rear decided "what next steps she would like to take," *id.* ¶ 47. On August 31, 2023, O'Rear gave HR a formal report of the assault and salient text messages, and disclosed assailant Diaz's identity. *Id.* ¶ 48. And on October 2, 2023, an HR official notified O'Rear that Merkley had decided to "terminate Diaz, but he had been 'tipped off' and resigned in advance." *Id.* ¶ 49. The next day, the company notified O'Rear that Diaz would continue working for Merkley until November 8, 2023 at the latest, *id.* ¶ 50, and that if Diaz contacted O'Rear, "he would be fired," *id.* These assembled facts do not permit a claim of delay sufficient to support a claim of acquiescence, as the AC pleads that the corporate defendants investigated immediately, and took meaningful action to "ensure that the alleged offensive behavior would cease." *Sutherland*, 39 A.D.3d at 1152 (citation omitted); *see, e.g.*, *M.H. v. Starbucks Coffee Co.*, No. 2 Civ. 10507, 2023 WL 5211023, at *5 (S.D.N.Y. Aug. 13, 2023) ("[A] good-faith response to address misconduct precludes a conclusion that an employer has condoned misbehavior even if reasonable people could find that response insufficient." (citation omitted)); *Pace*, 257 A.D.2d at 103–04 (no acquiescence where "once notified, [employer] took immediate and adequate measures" to stop sexual harassment); *State Univ. of N.Y v. State Hum. Rts. Appeal Bd.*, 81 A.D.2d 688, 688–89 (3d Dep't 1981), *aff'd.* 55 N.Y.2d 896 (1982) (no acquiescence of sexual harassment where employer "fully investigated the charges against [employee], whose employment with [employer] ultimately terminated").

15

Finally, to the extent O'Rear seeks to hold the corporate defendants liable on a theory of imputed knowledge based on Diaz's role at Merkley, that theory, too, is insufficiently pled. For intentional assaults or harassment to be imputed to a corporate entity by way of proxy, the tortfeasor must be "so high-ranking in the corporation that his torts may be attributed to the organization." *LaBozzo*, 2002 WL 1275155, at \*4 (citing *Randall v. Tod-Nik Audiology, Inc.*, 270 A.D.2d 38, 39 (1st Dep't 2000) ("president, treasurer and 50% owner of the corporation" could be "proxy for the employer corporation" for purposes of sexual harassment claim)). Here, Diaz is alleged to have been a creative director. AC ¶ 84. There is no claim that he had a role in "high-level managerial" aspects of the corporate defendants' operations, as an executive or co-owner would, such that he served as "a proxy for the employer corporation[s]." *Randall*, 270 A.D.2d at 38–39. That liability theory therefore fails. *See, e.g., N.Y. State Div. of Hum. Rts. v. Hawk*, 195 A.D.3d 1395, 1397 (4th Dep't 2021) (holding that employer "may be held liable for [owner and president's] conduct because he was 'within the class of an employer organization's officials who may be treated as the organization's proxy'") (quoting *Winkler v. N.Y. State Div. of Hum. Rts.*, 59 A.D.3d 1055, 1056 (2009)); *Franco v. Hyatt Corp.*, 189 A.D.3d 569, 570 (1st Dep't 2020) ("Proof of condonation and acquiescence is not necessary where discriminatory conduct is perpetrated by a high-level managerial employee or someone sufficiently elevated in the employer's business organization to be viewed as its proxy."). The Court therefore dismisses the sexual battery claim as brought against the corporate defendants.

## B.    Gender-Motivated Violence

The AC next alleges that Diaz subjected O'Rear to gender-based violence by sexually assaulting her without her consent, AC ¶ 79, and that the corporate defendants authorized and ratified this wrong by continuing to employ him after their investigation concluded, *id.* ¶ 80.

The GMVPA creates a cause of action for "any person claiming to be injured by a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender." N.Y.C. Admin. Code § 10-1104. The New York City Council passed the GMVPA in 2000 in response to the decision in *United States v. Morrison*, 529 U.S. 598 (2000), invalidating the remedy for gender-motivated crimes in the federal Violence Against Women Act ("VAWA"). The GMVPA defines a "crime of violence motivated by gender" as "a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender." *Id.* § 10-1103. "[C]rime of violence," in turn, is defined as

> [A]n act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction.

*Id.* These provisions of the GMVPA were "adopted verbatim from VAWA." *Breest*, 180 A.D.3d at 88. To state a claim under the GMVPA based on a predicate crime against the person, a complaint must plead: "(1) the alleged act constitutes a misdemeanor or felony against the person; (2) that was perpetrated because of plaintiff's gender; (3) in part because of animus against plaintiff's gender; and (4) resulted in injury." *Baldwin v. TMPL Lexington LLC*, No. 23 Civ. 9899 (PAE), 2024 WL 3862150, at *12 (S.D.N.Y. Aug. 19, 2024).

### 1.    Diaz

The AC adequately pleads that Diaz committed a gender-motivated crime of violence. For the reasons above, it adequately pleads sexual battery in the form of a rape, a quintessential crime of violence. In moving to dismiss, Diaz argues that his conduct, as pled, did not (1) evince "hatred towards women" or "gender-based animus," or (2) "pose[] a serious risk of physical injury." Diaz Br. at 9–10. Those arguments fail.

17

First, as this Court—and the Appellate Division—have recognized, "allegations of rape and sexual assault state a claim under the GMVPA because '[m]alice or ill will based on gender is apparent from the alleged commission of the act itself.'" *Baldwin*, 2024 WL 3862150, at *13 (quoting *Breest*, 180 A.D.3d at 94); *see also Doe v. Gooding*, No. 20 Civ. 6569, 2021 WL 5991819, at *5 (S.D.N.Y. July 29, 2021) (granting default judgment to plaintiff on GMVPA claim based on rape). Because the AC alleges Diaz raped O'Rear, it necessarily pleads gender-based animus on Diaz's part. *See Breest*, 180 A.D.3d at 94 ("Without consent, sexual acts such as [rape or sexual assault] are a violation of the victim's bodily autonomy and an expression of the perpetrator's contempt for that autonomy. . . . Animus inheres where consent is absent.").

Second, in pleading that the perpetrator raped an unconscious victim, the AC pleads the element of injury. Describing rape, the Supreme Court has explained:

> [Rape] is highly reprehensible, both in a moral sense and in its almost total contempt for the personal integrity and autonomy of the female victim and for the latter's privilege of choosing those with whom intimate relationships are to be established. Short of homicide, it is the 'ultimate violation of self.' It is also a violent crime because it normally involves force . . . to overcome the will and the capacity of the victim to resist. Rape is very often accompanied by physical injury to the female and can also inflict mental and psychological damage. Because it undermines the community's sense of security, there is public injury as well.

*Coker v. Georgia*, 433 U.S. 584, 597–98. The AC's factual account of O'Rear's experience is in accord. It pleads that Diaz sexually assaulted the unconscious O'Rear, AC ¶ 17, and, on learning of the assault, O'Rear "freak[ed] out," and reported to a colleague that Diaz "took advantage of [her] after the holiday happy hour," *id.* ¶ 31. It also pleads that when O'Rear reported the sexual assault to a higher-up, she "experience[d] a panic attack in the very bathroom where she was raped." *Id.* ¶ 41. These facts adequately plead injury. *See Doe v. Olive Leaves, Inc.*, No. 18 Civ. 5734, 2024 WL 3048373, at *11 (E.D.N.Y. Feb. 16, 2024) (complaint pled injury under the

GMVPA in alleging emotional distress); *Doe v. Gonzalez*, No. 21 Civ. 4580, 2023 WL 5979182, at *6 (E.D.N.Y. Aug. 4, 2023) (similar).

The Court thus sustains O'Rear's GMVPA claim as to Diaz.

### 2.    Corporate Defendants

The AC does not plead a viable GMVPA claim against the corporate defendants. The statute "provides for a cause of action against . . . any entity that is alleged to have facilitated the gender-based crime." *JL v. The Rockefeller University*, 2023 WL 3757389, at *6 (N.Y. Sup. Ct. May 25, 2023). But, as pled, the corporate defendants did not do anything to "commit[], direct[], enable[], participate[] in, or conspire[] in the commission" of Diaz's assault of O'Rear. N.Y.C. Admin. Code § 10-1104. The AC does not allege that these defendants had foreknowledge of the crime or of Diaz's predilection to commit such a crime. Further, the rape took place outside of work hours, and the corporate defendants did not facilitate it. The Court therefore dismisses the GMVPA claim against these defendants.

### C.    Sexual Harassment Under the NYCHRL

Diaz, but not the corporate defendants, moves to dismiss the AC's sexual harassment claim under the NYCHRL.[4] The AC adequately pleads such a claim.

The NYCHRL's standards for liability for sexual harassment are more permissive than those of Title VII. *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). Unlike Title VII, the NYCHRL does not require a plaintiff claiming sexual harassment to prove that the conduct was severe and pervasive. It requires only that the plaintiff demonstrate she was subjected to "unwanted gender-based conduct." *Erasmus v. Deutsche Bank*

---

[4] The corporate defendants also do not move to dismiss O'Rear's sexual harassment claim against them under Title VII. There is no Title VII claim against Diaz, as Title VII does not provide for individual liability. *See Patterson v. Cnty. of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004).

*Americas Holding Corp.*, No. 15 Civ. 1398 (PAE), 2015 WL 7736554, at *7 (S.D.N.Y. Nov. 30, 2015) (quoting *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 76 (1st Dep't 2009)); *see Gallagher v. AEG Mgmt. Brooklyn, LLC*, No. 16 Civ. 4779, 2017 WL 2345658, at *7 (E.D.N.Y. May 30, 2017) (at motion to dismiss stage, a complaint need only plead "evidence of unwanted gender-based conduct") (quoting *Lenart v. Coach Inc.*, 131 F. Supp. 3d 61, 69 (S.D.N.Y. 2015)). To prevail, the plaintiff "need only demonstrate 'by a preponderance of the evidence that she has been treated less well than other employees because of her gender.'" *Mihalik*, 715 F.3d at 110 (quoting *Williams*, 61 A.D.3d at 76). However, "district courts must be mindful that the NYCHRL is not a general civility code." *Id.* (quoting *Williams*, 61 A.D.3d at 76).

As discussed above, sexual assault is quintessentially "unwanted gender-based conduct." *Erasmus*, 2015 WL 7736554, at *7. The Court thus denies Diaz's motion to dismiss O'Rear's NYCHRL claim.

### D.    Negligent Supervision Against the Corporate Defendants

The corporate defendants move to dismiss the AC's negligent supervision claim, arguing that the claim is barred by New York's Workers' Compensation Law, N.Y. Workers' Comp. Law § 29(6), or, in the alternative, that the AC does not plead their sufficient foreknowledge of Diaz's propensity for sexual assault to support liability. Corp. Defs. Br. at 4–7.

The first argument fails. Claims under New York law of negligent supervision by employees against their employers are governed by the New York Workers' Compensation Law. It provides that "the right to compensation or benefits under this chapter shall be the exclusive remedy to an employee . . . when such employee is injured . . . by the negligence or wrong of another in the same employ[.]" N.Y. Workers' Comp. Law § 29(6). An employer can be held liable in tort typically "only when an employee acts outside of the scope of his employment and vicarious liability cannot obtain." *Marotta v. Palm Mgmt. Corp.*, No. 5 Civ. 10688, 2009 WL

497568, at *4 (S.D.N.Y. Feb. 25, 2009). Such, however, is the case here. As explained, Diaz's sexual misconduct—as to both sexual harassment and sexual assault—occurred outside his employment and afield from his creative director role. The Workers' Compensation Law thus does not preempt O'Rear's negligent supervision claim. *See Spoon*, 120 A.D.2d at 860 ("[T]he action is not barred by the exclusivity provisions of the [New York] Workers' Compensation Law, since a factual issue has been raised as to whether [defendant] authorized an intentional tort on the part of its employee." (citation omitted)).

A plaintiff asserting a state-law "claim for negligent supervision must prove: (1) the tortfeasor and defendant were in an employee-employer relationship; (2) the employer knew or should have known of the employee's propensity for the tortious conduct; and (3) the tort was committed on the employer's premises or with the employer's chattels." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 94 (2d Cir. 2011). The first and third elements are not in dispute. The AC alleges Diaz worked for the corporate defendants as a creative director, AC ¶ 84, that he sexually assaulted O'Rear at the Merkley office, *id.* ¶ 17, and that he sexually harassed female employees during work meetings, *see, e.g., id.* ¶ 55.

The second element, however, raises distinct legal and factual questions as to whether the corporate defendants knew or should have known of Diaz's propensity to sexually assault or sexually harass. The Court discusses each theory of liability in turn.

As to the former, the parties dispute whether foreseeability of an employee's propensity for sexual assault, based on that employee's propensity to sexually harass, permits liability for negligent supervision to attach, and whether the corporate defendants knew or should have known of Diaz's propensities. "New York law appears to take differing approaches relating to foreseeability in cases alleging that sexual assault by an employee was foreseeable to the

21

employer." *Doe v. Montefiore Med. Ctr.*, 598 F. App'x 42, 43 (2d Cir. 2015). In some cases, "the plaintiff must offer evidence that the employer knew (or should have known) of the employee's 'propensity . . . to engage in inappropriate sexual conduct.'" *Id.* (citing *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004)). In others, "the plaintiff has been required to show only that the employer knew (or should have known) of the employee's propensity to engage in physical assault, whether or not such conduct was of a sexual nature." *Id.* (citing *Dawn VV v. State of N.Y.*, 47 A.D.3d 1048, 1051 (3d Dep't 2008)). Generally, the plaintiff must show that the employer knew or should have known of the employee's "prior misconduct . . . of the same kind that cause the injury," but "general, unrelated or lesser allegations of prior wrongdoing are insufficient." *Alsaud*, 12 F. Supp. 3d at 681.

Here, the AC does not plausibly allege that the corporate defendants knew or should have known of Diaz's propensity for sexual assault. *See, e.g.*, AC ¶¶ 12–14; *see also id.* ¶ 51 (noting that, as a result of the corporate defendants' investigation, they "*would have quickly learned that Diaz was a known sexual predator, to the extent [they] w[ere] somehow ignorant of that fact.*" (emphasis added)). Courts in this Circuit and New York State agree that an employee's propensity for wrongdoing could put an employer on notice of similar behaviors. *See Zilioli v. City of N.Y.*, No. 17 Civ. 9495, 2020 WL 1548763, at *9 (S.D.N.Y. Apr. 1, 2020) ("An employer does not need to have notice of an employee's propensity 'to behave in the exact manner in which he behaved with' a plaintiff in order for liability to attach, 'only notice of [the employee's] propensity for that sort of behavior.'" (quoting *Doe v. City of N.Y.*, No. 15 Civ. 117, 2018 WL 6095847, at *7 (S.D.N.Y. Nov. 21, 2018)) (collecting cases); *Anna O. v. State*, 2011 WL 6957587, at *7 (N.Y. Ct. Cl. Oct. 19, 2011). However, the AC does not allege Diaz exhibited violent behavior or that his prior sexual harassment put the corporate defendants on notice that

22

he might commit a sexual assault. *See, e.g.*, *Montefiore Med. Ctr.*, 598 F. App'x at 43 (affirming summary judgment for defendants on negligent supervision claim where fact-finder could not conclude they "knew or should have known of [employee's] propensity to commit an assault—let alone a sexual assault"); *Lee v. Albarran*, No. 23 Civ. 11215, 2024 WL 4987310, at *6 (S.D.N.Y. Dec. 5, 2024) (granting motion to dismiss negligent supervision claim "predicated on allegations of sexual assault," in part, because "a propensity to sexually harass is not sufficient to establish a propensity to sexually assault"); *City of N.Y.*, 2018 WL 6095847, at *8 (denying summary judgment for defendant of negligent supervision claim where evidence existed of, *inter alia*, a prior sexual assault allegation against the employee).  Accordingly, O'Rear's negligent supervision claim predicated on Diaz's alleged propensity to commit sexual assaults fails.

Although a closer question, the AC falls short of plausibly alleging that the corporate defendants knew or should have known of Diaz's propensity to sexually harass female employees.  "New York courts have held in employee sexual misconduct cases that an employer is only liable for negligent supervision or retention if it is aware of *specific* prior acts or allegations *against the employee*."  *Alsaud*, 12 F. Supp. 3d at 680 (emphasis added) (collecting cases).  As to sexual harassment committed by Diaz before the assault, the AC alleges that Diaz made "outrageous sexual comments about female employees in group meetings," AC at 1, and "flash[ed] his naked body on a video call with another female employee," *id.*  It also pleads that Diaz "was an open and notorious sexual harasser long before his sexual assault of Ms. O'Rear," *id.* ¶ 53, such that even a male colleague "warned Ms. O'Rear to 'watch out' for Diaz," *id.* ¶ 27, and that "Merkley took no action whatsoever against Diaz for his explicit and overt conduct," *id.* ¶ 55.  However, it does not plead that any employee actually complained to the corporate defendants about sexual harassment committed by Diaz, or that senior-level employees were

present during or had been told of these events. *See, e.g., Papelino*, 633 F.3d at 94–95 (affirming

dismissal of negligent supervision claim as to sexual harassment where no complaints had been

made before the harassment at issue); *Sharp v. Town of Greece*, No. 9 Civ. 6452, 2010 WL

1816639, at *8 (W.D.N.Y. May 3, 2010) (denying motion to dismiss negligent supervision claim

where employer knew of misconduct through reports and failed to act); *Vione v. Tewell*, 820

N.Y.S.2d 682, 687 (Sup. Ct. 2006) (similar). Although "[n]o statutory requirement exists that

negligent supervision claims be plead with specificity," *Krystal G. v. Roman Cath. Diocese of*

*Brooklyn*, 933 N.Y.S.2d 515, 523 (Sup. Ct. 2011), more is needed than conclusory allegations of

notice, *see Murray v. Nazareth Reg'l High Sch.*, 579 F. Supp. 3d 383, 390 (E.D.N.Y. 2021)

(dismissing negligent supervision claim where employer awareness not sufficiently alleged

despite "broader allegation that the [employer] has been known to . . . cover-up [] sexual abuse").

The Court therefore grants the corporate defendants' motion to dismiss O'Rear's

negligent supervision claim.

## IV.    Motion for Sanctions

O'Rear separately moves for sanctions against Diaz under Federal Rule of Civil

Procedure 11 and 28 U.S.C. § 1927. Terming Diaz's motion to dismiss frivolous, she argues that

it was "so legally deficient [that it] can only have been brought to unreasonably and vexatiously

multiply the proceedings[.]" Pl. Diaz Opp. at 10. The Court denies O'Rear's sanctions motion

on substantive and procedural grounds.

Under Rule 11, the process leading to the imposition of sanctions may be initiated by

either counsel or the court. Rule 11(c)(2) sets forth the procedure to be followed where counsel

moves for sanctions based on the offending attorney's court submissions. And it creates a

procedural mechanism that gives the offending attorney a "last clear chance" to modify or

withdraw the challenged submission so as to avoid sanctions. Fed. R. Civ. P. 11(c)(2). Under

that provision, a motion for sanctions is initially to be served only on the offending attorney, and not filed with the court. *Id.* A motion for sanctions can be filed with the court only if, 21 days after such service, the challenged submission has not been "withdrawn or appropriately corrected." Fed. R. Civ. P. 11(c)(2). Upon such a motion, the court may impose sanctions if the offending attorney responsible for the submission is found to have acted with "objective unreasonableness," *In re Pennie & Edmonds LLP*, 323 F.3d 86, 90 (2d Cir. 2003), such as "where it is patently clear that a claim has absolutely no chance of success," *Healey v. Chelsea Res., Ltd.*, 947 F.2d 611, 626 (2d Cir. 1991) (quoting *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1005 (2d Cir. 1988)). *See also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 579 F.3d 143, 150 (2d Cir. 2009).

Counsel may also seek sanctions under 28 U.S.C. § 1927 when "[a]ny attorney . . . so multiplies the proceedings in any case unreasonably and vexatiously[.]" Sanctions under 28 U.S.C. § 1927 require "clear evidence that the conduct at issue is (1) entirely without color and (2) motivated by improper purposes." *Rabin v. Dow Jones & Co., Inc.*, 665 F. App'x 21, 23 (2d Cir. 2016); *see also Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 113–14 (2d Cir. 2009) ("A finding of bad faith, and a finding that conduct is without color or for an improper purpose, must be supported by a high degree of specificity in the factual findings."). "The attorney's actions must be so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Zurich Am. Ins. Co. v. Team Tankers A.S.*, 811 F.3d 584, 591 (2d Cir. 2016) (citation omitted); *see also, e.g.*, *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 264 (2d Cir. 2015).

O'Rear is correct that Diaz's motion to dismiss was uncommonly weak to the extent that it attacked O'Rear's credibility. Pl. Diaz Opp. at 10. Such an argument indeed ordinarily has no

purchase under Rule 12(b)(6). But, fairly read, aspects of Diaz's motion went beyond credibility attacks. It argued instead that the AC's account was internally inconsistent and thus implausible. Although that argument failed badly, the Court is unprepared to hold that it was made in bad faith, vexatious, or for an improper purpose. *See, e.g.*, *Mareno v. Rowe*, 910 F.2d 1043, 1047 (2d Cir. 1990) ("The positions advanced by [plaintiff] and his attorney, however faulty, were not so untenable as a matter of law as to necessitate sanction. Nor did they constitute the type of abuse of the adversary system that Rule 11 was designed to guard against."); *Minerva v. Cnty. of Suffolk*, No. 15 Civ. 6433, 2017 WL 395209, at *7 (E.D.N.Y. Jan. 30, 2017) (denying sanctions, in part, because there was "no evidence that plaintiffs['] . . . legal arguments (including their unsuccessful efforts to allege a plausible Section 1983 claim) [we]re not so untenable as to be deemed frivolous"); *Sci. Components Corp. v. Sirenza Microdevices, Inc.*, No. 3 Civ. 1851, 2007 WL 1026411, at *5 (E.D.N.Y. Mar. 30, 2007) ("The court agrees that [defendant] has been imprudent in choosing to litigate this claim. However, Rule 11 sanctions are not appropriate where there is a viable claim that is weak."); *Eisenberg v. Yes Clothing Co.*, No. 90 Civ. 8280, 1992 WL 36129, at *4 (S.D.N.Y. Feb. 19, 1992) ("Rule 11 sanctions are not to be imposed on every litigant that files a motion that the Court deems premature, or ill-advised, or weak.").

Insofar as O'Rear's motion pursues Rule 11 sanctions, her motion separately fails because it is procedurally improper. Before a motion for sanctions is filed with the Court, it must "be served under Rule 5," and "it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." Fed. R. Civ. P. 11(c)(2). This provision, known as the "safe harbor" period, is meant to give fair process to the person against whom the sanctions motion is to be brought. The provision requires that that person "be

informed of: (1) the source of authority for the sanctions being considered; and (2) the specific conduct or omission for which the sanctions are being considered so that the subject of the sanctions motion can prepare a defense." *Schlaifer Nance & Co.*, 194 F.3d 323, 334 (2d Cir. 1999); *see Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 175–76 (2d Cir. 2012). The safe harbor period also gives the subject of the intended motion an opportunity to avoid sanctions, by withdrawing the sanctionable filing within 21 days of being served with notice of it. Here, however, O'Rear did not serve Diaz with her motion for sanctions before filing it with the Court. *See* Diaz Reply at 10. The Court thus denies the motion. *See, e.g., Lawrence v. Richman Grp. of CT LLC*, 620 F.3d 153, 158 (2d Cir. 2010) (denying sanctions where plaintiff was not given "notice of defect and an opportunity to correct or withdraw that filing before moving for sanctions"); *Mintz & Gold LLP v. Daibes*, No. 15 Civ. 1218 (PAE), 2015 WL 2130935, at *9 (S.D.N.Y. May 6, 2015), *aff'd*, 643 F. App'x 35 (2d Cir. 2016) ("Sanctions may not be awarded under Rule 11(c)(2) where proper notice and opportunity to withdraw or correct the filing were not provided to the party to be sanctioned.")

Additionally, under Rule 11(c)(2), a motion for such sanctions "must be made separately from any other motion." Fed. R. Civ. P. 11(c)(2). A "request for sanctions [] included in [a] memorandum addressing the underlying issues before the district court" does not satisfy this requirement. *Perpetual Sec., Inc. v. Tang*, 290 F.3d 132, 142 (2d Cir. 2002) (cleaned up) (reversing sanctions award for lack of separate motion). O'Rear's motion for Rule 11 sanctions is thus also procedurally deficient because she included her request in her opposition to Diaz's motion to dismiss. *See* Pl. Diaz Opp. at 10; *see, e.g., Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 51 (2d Cir. 2008) (affirming denial of defendants' Rule 11 motion where defendants "failed to make a separate motion for sanctions under Rule 11, and therefore failed to comply

27

with the procedural requirements of the rule"); *Begonja v. Vornado Realty Tr.*, 159 F. Supp. 3d 402, 415 (S.D.N.Y. 2016) ("[D]efendants' request for attorneys' fees under Rule 11 was made together with the motion to dismiss rather than as a separate motion, and for that reason alone it must be denied."); *Banfield v. UHS Home Attendants, Inc.*, No. 96 Civ. 4850, 1997 WL 342422, at *3 (S.D.N.Y. June 23, 1997) (denying motion for sanctions "[b]ecause Plaintiff failed to comply with either of Rule 11's procedural requirements").

## CONCLUSION

For the foregoing reasons, the Court denies Diaz's motion to dismiss and grants the corporate defendants' motion to dismiss three of the five claims against them. The Court also denies O'Rear's motion for sanctions. The Clerk of Court is respectfully directed to terminate the motions pending at Dockets 32, 54, and 58.

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: January 23, 2025
New York, New York

28